WELCH, Presiding Judge.
Janies Lee Ware appeals from his convictions for first-degree burglary, a violation of § 13A-7-5(a)(1), Ala.Code 1975;[1] first-degree robbery, a violation of § 13A-8-41(a)(1), Ala.Code 1975; and first-degree rape, a violation of §' 13A-6-61(a)(1), Ala.Code 1975. He presents four issues on appeal.

Facts

On the night of June 8, 1993, the victim, L.M., a graduate student enrolled at the University of Alabama in Tuscaloosa, was asleep.in her bed when she was awakened by a man lying on top of her and covering her eyes with what she believed was a towel and a plastic bag. L.M. struggled with her attacker, who was forcibly pulling her panties off, and during the struggle she felt something sharp in'the man’s back pocket. Having felt what she thought was a weapon, she feared for her life and began to beg the man not to kill her. Before the man left L.M.’s room, she was forcibly raped two times and the rapist attempted to rape L.M. a third time but was unsuccessful. When he left her room, the rapist left the blindfold over L.M.’s eyes, bound L.M.’s feet[2] with an electrical cord, and instructed her not to move. L.M. heard her attacker rambling throughout her house. When L.M. believed her assailant had left her house, she freed herself and telephoned the police and her boyfriend. Money and a diamond ring had been taken from her house. L.M. was taken to the hospital, where a rape.kit analysis was prepared. Other than the rape kit, .no physical evidence was obtained from the crime scene' that could be used to identify the rapist.
*384 The case remained unsolved for several years. In 2004 the Alabama Department of Forensic Sciences (“the DFS”) obtained a grant that enabled “cold-case rapes” to be tested for the presence of. deoxyribonu-cleic acid (“DNA”), which if present, could lead to the identification of the rapist. (Hearing on motion to dismiss, R. 12.) DNA identification is
“fa] method of scientific identification based on a person’s unique genetic makeup; sped., the comparison of a person’s deoxyribonucleic acid (DNA) — a patterned chemical structure of genetic information — with the DNA in a biological specimen (such as blood, tissue, or hair) to determine whether the person is the source of the specimen. DNA is used in criminal cases for purposes such as identifying a victim’s remains, linking a suspect to a crime, and exonerating an innocent suspect.”
Black’s Law Dictionary 516-17 (8th ed,2004). DNA identification is also termed DNA profiling. Id.
Thus, in 2004, the Tuscaloosa Police Department delivered to the DFS the rape kits from several unsolved rape cases, including L.M.’s. Later in 2004, the DFS delivered the rape kits, including L.M.’s, to Orchid Cellmark Laboratory-. (“Orchid”) in Germantown, Maryland.[3] (R. 426, 429.)
From L.M.’s rape kit, the laboratory technicians processed the biological'material, i.e., the vaginal swabs,[4] taken from L.M.’s rape kit, tested the'DNA present on the swabs, and recorded in the case file a visual analysis of the DNA profile in the form of graphs and charts. The record discloses that as many as six laboratory technicians[5] performed tests ■ on L.M.’s vaginal swabs. (See CR. 279.) The laboratory technicians also compiled a “Report of Laboratofy Examination.” (CR. 258-60.) The resulting report is the' DNA profile report. It documented the items tested, provided information and scientific conclusions about the tested material, and stated that the evidence would be returned to the DFS. The DNA profile report was reviewed and approved by Orchid’s laboratory director, Lewis O. Maddox, Ph.D., and by Orchid’s molecular geneticist, Jason E. Kokoszka, Ph.D.
Jason E. Kokoszka testified at Ware’s trial. Kokoszka testified that every forensic laboratory had standard operating procedures and guidelines setting forth how the laboratory .work is. to be performed and the way in which the laboratory material is collected. Kokoszka testified that in 2004, in addition to being a molecular geneticist at Orchid, he was also a custodian of records. (R. 704.) The DNA profile report in L.M.’s case represented a report that Orchid “routinely” issued “following the analysis” of the material' submitted in a case and that it was “maintained in the regular course of business” at Orchid. (R. 704.) ‘ The report lists the items that were tested as L.M.’s oral swab, L.M.’s vaginal swab, and L.M.’s blood sample. The body of the report details the analyses that were performed on the evidence and the scientific conclusions that were drawn from the analyses. This included a chart exhibiting the “donor profile” of the “possible types of -the primary male donor” *385 determmed from the DNA testing. (CR. 258, 260.) The report .also “contains the, signatures of the two individuals who were taking responsibility for the work as well as any data supplied with the report.” (R. 705.) Kokoszka was “one of the individuals taking responsibility for the work informed [sic] in [the instant] case” and his signature is on the report. (R. 705, 711.) He sent the report and'the case file to-Angelo DellaManna at the' DFS. During' Kokoszka’s examination, the DNA report was admitted into evidence over Ware’s Confrontation Clause objection. (R. 705.) In admitting the report, the trial court stated: “I believe that the cases following Crawford [v. Washington, 541 U.S. 36 (2004),] and Crawford, the supervisor of the lab work and that prepared the report, if that person is present to — present and subject to cross-examination, Crawford is satisfied. The Court is going to overrule the objection.” (R. 708.)
Kokoszka also testified regarding L.M.’s ease file. Kokoszka testified that the case file was also kept in “the regular course of business” at Orchid and that he was the custodian of these records. (R. 710.) The case file reflects “all the analysis that occurred in L.M.’s casé from start to finish, culminating with the ... review checklists that the person reporting the cáse and reviewing the case would fill "out to show what actually occurred inside the case.” (R. 709.) Kokoszka further testified that as the reviewer of all the work done in this case, he also reviewed the “identification of the semen upon the sample which occurred prior to the DNA testing.” (R. 711.)' He “reviewed all the analyses that were performed to ensure that they were performed in accordance with [the standard operating procedures] and also ensured that the conclusions drawn from the data were accurate and appropriate as well.” (R. 711.) Kokoszka initialed the review sheets in, the case file to reflect that he had reviewed the case and he-stated that his personal review meant that the work was performed “in accordance with the guidelines” that were in place. (R. 712.) He stated that “[t]o [his] knowledge there were no errors that occurred during the analysis of the case.” (R. 713.) The ease file was admitted during Kokpszka’s examination over Ware’s Confrontation Clause objection.
The DNA profile report and the case file generated by the Orchid laboratory technicians, and approved by Kokoszka, were sent t.o Angelo DellaManna at the DFS. DellaManna is an expert in “DNA forensic biology” and “director of the DNA Program for Statewide Forensic Biology Efforts” for the DFS. (R. 411, 479.) Della-Manna testified that the Orchid laboratory technicians properly performed all tests on-the biological material in . accordance, with the controls and procedures put ip. place by the DFS and that there were “no errors in [L.M.’s] case.” (R. 501, 538.)' Del-laManna compared the DNA profile sent to him by Orchid to other known DNA profiles contained in the Combined DNA Index System (“CODIS”), which is a nationwide repository for DNA-specimen information. See § 36-Í8-21(j), Ála.Code 1975. DellaManna determmed that the DNA profile received from Orchid matched Ware’s[6] DNA profile in CODIS. (R. 537.)
Pursuant to' routine procedure at the DFS, once the DNA match was ascertained, the DFS removed Ware’s CODIS sample from storage and retested it “to ensure that the profile ... within CODIS [was] the profile ... associated with the physical sample.” (R. 504-05.) Then, a *386 second analyst at the DFS independently reviewed and compared Ware’s known CO-DIS DNA profile to the unknown DNA profile obtained from the semen taken from L.M.’s rape kit and' sent to the DFS by Orchid. (R. 514.) In October 2006, a DNA sample, in the form of cheek swab, was taken from Ware. Ware’s cheek sample was “r[u]n through the DNA test process in [the] laboratory in Alabama,” and the DNA profile from Ware’s cheek sample was compared to Ware’s CODIS profile and the unknown DNA profile created from the semen taken from L.M.’s rape kit. (R. 515.) “The DNA profile known to be from Mr. Ware [the cheek sample] matched ... [the] CODIS sample as well as the semen profile from the vaginal swabs of [L.M.] ” (R. 515-16.) DellaMan-na used Orchid’s DNA profile to calculate population frequencies, and he explained how he reached his conclusions that Ware’s DNA matched the DNA extracted from the semen removed from L.M.’s rape Mt.
Ware was not afforded an opportunity during the trial to confront and to cross-examine the Orchid laboratory technicians who performed the test underlying the DNA profile report or the data collected in L.M.’s case file. Ware was ultimately charged and convicted of first-degree burglary, first-degree robbery, and first-degree rape.
I.
Ware contends that the trial court violated his Sixth Amendment right to confront and to cross-examine witnesses against him when the court admitted into evidence testimony and reports based on the work product of the laboratory technicians at Orchid who did not testify at the trial. Specifically, Ware contends that the DNA profile and report were testimonial in nature and, thus, that their introduction violated the United States Supreme Court decisions in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).
In Crawford, the United States Supreme Court clarified “that the Framers [of the Sixth Amendment] would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.” 541 U.S. at 53-54. In Melendez-Diaz v. Massachusetts, 557 U.S. at 310-12, 129 S.Ct. at 2532, the United States Supreme Court held that a certificate of analysis created by a state-laboratory technician was testimonial and covered by the Confrontation Clause. Ware argues that these cases provide authority for finding that he was denied the right to confront witnesses against him.

Preservation

A.
The State suggests that Ware’s arguments in the trial court were not a specific request to cross-examine the laboratory technicians based on the Confrontation Clause. However, the record is replete with Ware’s argument challenging the admission of all testimony regarding the DNA profile report generated by the absent laboratory technicians on Confrontation Clause grounds. Moreover, this issue was preserved when the circuit court granted a “standing objection” to Ware’s claim that he was being denied his constitutional right to confront the Orchid laboratory technicians. (R. 469-70.) The trial court clearly understood Ware’s objection as it concerned his desire to confront and to cross-examine the laboratory technicians. See Toles v. State, 854 So.2d 1171, 1174 (Ala.Crim.App.2002); Covington v. *387 State, 620 So.2d 122, 127 (Ala.Crim.App.1993); Ex parte Webb, 586 So.2d 954, 956 (Ala.1991); Ex parte McCall, 594 So.2d 628, 631 (Ala.1991); Ex parte Pettway, 594 So.2d 1196, 1200 (Ala.1991); Felder v. State, 593 So.2d 121, 122-23 (Ala.Crim.App.1991); and Marshall v. State, 570 So.2d 832, 834 (Ala.Crim.App.1990). Here, Ware not only preserved his claim, but it is also abundantly clear that the trial court was aware of the grounds underlying Ware’s objections.
B.
The State also contends that Ware’s objection to evidence regarding the DNA profile report was waived by Ware’s own introduction of similar evidence. “Where a defendant voluntarily introduces the same evidence to which he had previously objected, he waives his objection. Bolden v. State, 568 So.2d 841, 848 (Ala.Crim.App.1989)[, abrogated on other grounds, Henderson v. State, 715 So.2d 863 (Ala.Crim.App.1997).]” (State’s brief, at pp. 21-22.) In addition to the 1993 rape involving L.M., Ware was also charged with the 1995 rape of P.D. Like, L.M.’s case, P.D.’s case was a “cold-case rape” and P.D.’s rape kit was sent to Orchid for DNA testing in 2004 after the DFS received funding for such testing. The State dropped the charges in P.D.’s case because the DNA evidence — i.e,, the genetic match between the material in P.D.’s rape kit and Ware’s CODIS profile — in P.D.’s case was weak and rendered even weaker by alibi evidence calling into question Ware’s guilt.
At Ware’s trial, during direct examination by the State, Kokoszka and DellaMan-na testified regarding the accuracy and reliability of the DNA testing. During Ware’s cross-examination of DellaManna, DellaManna testified that he received a DNA profile from Orchid in P.D.’s case. He used Orchid’s report to draw conclusions in P.D.’s case just as he had done in L.M.’s case. Ware introduced DellaMan-na’s report in which DellaManna had stated that Ware was a “potential minor- contributor” of the DNA mixture found on an oral swab taken from P.D. following her rape and contained in her rape kit. Della-Manna explained that a comparison between an unknown donor profile and a CODIS profile disclosing that the donor is a “potential minor contributor” is a not as strong a comparison as a comparison revealing a match. The defense attempted to exploit the fact that even though Della-Manna did not “have a high degree of confidence in [P.D.’s] ease” the report was nevertheless sent to the Tuscaloosa police department, and, as a result, Ware was charged with the rape of P.D. — charges the State ultimately dropped. (R. 609.) The inference Ware hoped to draw was that DNA evidence is fallible.
The State argues on appeal that “[Ware] should ... not be allowed to take the position in a trial that the absence of the lab technicians is crucial for the admission of evidence presented by the State but not for the admission of similar evidence upon which he relies.” (State’s brief, at p. 23.) Ware replies to this assertion by arguing that “once the DNA evidence was admitted over their objections, Mr. Ware’s defense attorneys had no other choice but to attack the reliability of that evidence. They did not thereby waive their objections to the admission of the evidence.” (Ware’s reply brief, at p. 5.) We agree. In Bolden v. State, 568 So.2d 841 (Ala.Crim.App.1989), an appeal from an arson conviction, the defense objected to the State’s questions regarding the payment of insurance proceeds associated with previous fires at the home of the defendant.- The trial court allowed the evidence. ■ Bolden was convicted, and he appealed. This Court determined that the objectionable testimony was cumulative to other testimony already *388 heard regarding earlier fires and the payment of insurance proceeds to repair the damage caused by the fires. Here,- Ware introduced evidence regarding the 1995 rape of P.D. in an attempt to show that the DNA-testing process is fallible — to show that the State had dropped the rape charges against Ware in-P.D.’s case because the DNA testing had proved to be too unreliable to obtain a conviction. This, in turn, was an attempt to strengthen Ware’s claim that he should be allowed to cross-examine the laboratory technicians who performed the actual testing on the rape kits. Evidence * offered under these circumstances is not cumulative evidence. Thus, Ware did not waive his objection aS argued by the State,

Arguments

Ware contends that the DNA profile report prepared by Orchid laboratory technicians, who did not attend the trial, was testimonial héarsay, and, thus, that it was erroneously admitted into evidence in violation of the Confrontation Clause over his objection. Ware argues that the analysts who did testify, DellaManna and Kokoszka, were not the technicians who performed the DNA testing and that he was unable to challenge the accuracy of the DNA profile, the conclusions drawn from the testing, the honesty or the incompetence of the technicians who performed the tests by questioning DellaManna and Kokoszka. Ware argues that Crawford, Melendez-Diaz, and a Texas Court of Appeals case, Cuadros-Fernandez v. State, 316 S.W.3d 645 (Tex.App.2009), support his assertion. A brief summary of each ease follows.
-In Crawford, Crawford, was charged with the assault and attempted murder of Kenneth Lee. Lee' had allegedly attempted to rape Crawford’s wife, Sylvia. Crawford claimed. self-defense. Sylvia, a witness to the assault, gave a statement to police suggesting that Crawford did not stab Lee in self-defense, but she did not testify at trial pursuant to the marital privilege as defined by the Washington state legislature. However, in order to prove that Crawford had not stabbed the victim in self-defense as he claimed, the State sought, to introduce statements that Sylvia had made during her interrogation by the police. The defense claimed that the introduction of Sylvia’s statements violated the Confrontation Clause because Sylvia could not be cross-examined. The Crawford Court held that where a witness’s out-of-court statement is testimonial, as Sylvia’s, it should be barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to. cross-examine the witness, regardless of whether the statement is deemed reliable by the trial court. 541 U.S. at 68 (“Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.”) (overruling Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (before Crawford, admissibility depended on the reliability of the out-of-court statements and reliable statements did not require the opportunity for a previous cross-examination)). ' Nontestimonial evidence was not affected by Crawford. Crawford, did not attempt to .define testimonial evidence. However, a step toward defining “testimonial” was taken in Melendez-Diaz.
In Melendez-Diaz, Melendez-Diaz was charged with distributing and trafficking cocaine. A laboratory technician tested two materials believed to be cocaine and determined that they were cocaine. The technician weighed the cocaine that was later, used as proof of trafficking. The technician then executed certificates of analysis attesting that the materials were *389 cocaine and their weights. “The certificates were sworn to before a notary public by technicians at the State Laboratory Institute of the Massachusetts Department of Public Health, as required under Massachusetts law. Mass. Gen. Laws, ch. 111, § 13.” Melendez-Diaz, 557 U.S. at 308, 129 S.Ct. at 2531. Melendez-Diaz objected to the admission of the certificates of analysis, arguing that Crawford, supra, required the technicians to testify in person. Over his objection, the trial court admitted the certificates of analysis into evidence as “ ‘prima facie evidence of the composition, quality, and the net weight of the narcotic ... analyzed.’ Mass. Gen. Laws, ch. 111, § 13.” Melendez-Diaz, 557 U.S. at 309, 129 S.Ct. at 2531.
Melendez-Diaz was convicted, and he appealed. The Appeals Court of Massachusetts rejected his Confrontation Clause argument and affirmed his conviction, “relying on the Massachusetts Supreme Judicial Court’s decision ... which held, that the authors of. certificates of forensic analysis are not subject to confrontation under the Sixth Amendment.” Melendez-Diaz, 557 U.S. at 309, 129 S.Ct. at 2531.
In a 5-4 decision, the United States Supreme Court found as follows:
“The documents at issue here, while denominated by Massachusetts law ‘certificates,’ are quite plainly affidavits: ‘declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths.’ Black’s Law Dictionary 62 (8th ed.2004). They «are incontrovertibly a ‘ “solemn declaration or affirmation made for the purpose of establishing or proving some fact.” ’ Crawford [v. Washington, 541 U.S. 36,] at 51, 124 S.Ct. 1354 [ (2004) ], (quoting 2 N. Webster, An American Dictionary óf the English Language (1828)). The fact in question is that the substance found in the possession of Melendez-Diaz and his codefendants was, as the prosecution claimed, cocaine — the precise testimony the analysts would be expected to provide if called at trial. The ‘certificates’ are functionally identical to live, in-court testimony, doing ‘precisely what a witness does on direct examination.’ Davis v. Washington, 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (emphasis deleted).
“Here, moreover, not only were the affidavits ‘“made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use .at a later trial,”’ Crawford, supra, at 52, 124 S.Ct. 1354, but under Massachusetts law the sole purpose of the affidavits was to provide ‘prima facie evidence of the composition, quality, and the net weight’ of the analyzed substance, Mass. Gen. Laws, ch. Ill, § 13. We can safely assume that the analysts were aware of the affidavits’ evidentiary purpose, since that purpose — as stated in the relevant state-law provision — was reprinted on the affidavits themselves.. See App. to Pet. for Cert. 25a, 27a, 29a.
“In short, under our decisiQn in Crawford the analysts’ affidavits were testimonial statements, and' the analysts were “witnesses’ for purposes of the Sixth Amendment.. Absent a showing that the analysts were .unavailable to testify, at trial and that petitioner-had a prior opportunity to cross-examine them, petitioner was entitled to ‘“be confronted with”’ the analysts at trial. Crawford, supra, at 54, 124 S.Ct. 1354.”
Melendez-Diaz, 557 U.S. at 311, 129 S.Cti at 2532. Moreover, the majority opinion rejected the “neutral scientific testing” argument, noting forensic evidence is not exempt from -the risk of manipulation. Melendez-Diaz, 557 U.S. at 318, 129 S.Ct. *390 at 2537. The majority reasoned that cross-examination would be useful in testing the analyst’s “honesty, proficiency, and methodology.” Melendez-Diaz, 557 U.S. at 321, 129 S.Ct. at 2538. In sum, the following arguments were rejected by the majority in Melendez-Diaz:
“(1) analysts were not removed from coverage of Confrontation Clause on theory that they were not ‘accusatory’ witnesses;
“(2) analysts were not removed from coverage of Confrontation Clause on theory that they were not conventional witnesses;
“(3) analysts were not removed from coverage of Confrontation Clause on theory that their testimony consisted of neutral, scientific testing;
“(4) certificates of analysis were not removed from coverage of Confrontation Clause on theory that they were akin to official and business records; and
“(5) defendant’s ability to subpoena analysts did not obviate state’s obligation to produce analysts for cross-examination.”
45 No. 6 Criminal Law Bulletin Art. 6.
However, Justice Thomas, the majority’s fifth vote, made it clear in his concurring opinion that he could concur in Melendez-Diaz because the certificate of analysis at issue was an affidavit and thus was testimonial. However, he stated that he “adhered to [his] position that ‘the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.’” Melendez-Diaz, 557 U.S. at 329, 129 S.Ct. at 2543 (quoting White v. Illinois, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (opinion concurring in part and concurring in judgment)). Specifically, Justice Thomas stated:
“I join the Court’s opinion in this case because the documents at issue in this case ‘are quite plainly affidavits,’ [Melendez-Diaz, 557 U.S. at 330, 129 S.Ct. at 2532], As such, they ‘fall within the core class of testimonial statements’ governed by the Confrontation Clause. [White v. Illinois, 502 U.S. 346, 365 (1992) ] (internal quotation marks omitted).”
Melendez-Diaz, 557 U.S. at 330, 129 S.Ct. at 2543 (Thomas, J., concurring).
Cuadros-Fernandez v. State, a Texas Court of Appeals case, broadly interpreted Melendez-Diaz to support Cuadros-Fer-nandez’s argument that the work product of a laboratory technician was testimonial. Cuadros-Fernandez was charged with the capital murder of a child who was less than two years of age, whom she was babysitting. Concisely, the State’s theory was that Cuadros-Fernandez slammed the victim’s head against a kitchen cabinet door and, in doing so, broke the cabinet. Cuad-ros-Fernandez had used masking tape to repair the broken cabinet. As part of the investigation, the police removed the broken cabinet and masking tape and delivered it to the Southwest Institute for Forensic Sciences (“SWIFS”). According to the report of the DNA analysis, SWIFS compared the DNA taken from the masking tape to a DNA analysis of Cuadros-Femandez, and it was a match. Cuadros-Fernandez, 316 S.W.3d at 652. Specifically:
“The report and most of the notes attached to the report were prepared by Kerri Kwist, a DNA analyst with SWIFS. Kwist did not testify at trial. Instead, the State introduced its exhibit 8 [‘the expert report and notes concerning analysis of the cabinet door for DNA,’] through the testimony of Andra Krick, a trace-evidence analyst at SWIFS. Krick testified that she was *391 present when the DNA samples were collected. Krick also testified that she was a custodian of records for SWIFS, the documents in exhibit 8 were business records of SWIFS kept in the regular course of business of SWIFS, the entries on those records were prepared in the regular course of business by an employee of SWIFS with personal knowledge of the events or acts recorded, and the records were made at or near the time of the event recorded. Krick was not a DNA analyst, she did not perform any of the DNA testing, and she could not testify to whether the DNA testing was performed properly.”
Cuadros-Fernandez, 316 S.W.3d at 654 (footnote omitted).
“Exhibit 8 included Kwist’s report describing the evidence tested, the results of the testing, Kwist’s conclusions (which appear to be summaries of the results), the statistical analysis of the results comparing the DNA profiles found in the testing to the general population, the disposition of the evidence, the additional comment that an unknown DNA profile found on the swab of the tape would be entered in the Combined DNA Index System, and a table of the DNA profiles of the evidence tested. The exhibit also contains many pages of graphs apparently concerning the testing, some containing handwritten notations, and • all initialed' ‘KK’; hand-written charts apparently concerning the testing; forms setting out the chain of custody of the evidence; forms listing the evidence submitted and the analysis requested; memoranda of telephone calls between Krick and Detective Adams and between Kwist and Krick concerning what evidence the State wanted tested; and a memorandum from Detective Adams to ‘Examiner’-briefly describing the case to explain why the State wanted the cabinet door and the tape tested for DNA.”
Cuadros-Fernandez, 316 S.W.3d at 655 (footnote omitted). Cuadros-Fernandez objected to the admission of exhibit 8 on the grounds that Kwist should have been present for cross-examination and that, thus, in her absence, the Confrontation Clause was violated.
Relying on Crawford and Melendez-Diaz, the Texas Court of Appeals couched the issue as “whether the DNA report in this case, althpugh not in the form of an affidavit, [was] testimonial.” Cuadros-Fernandez, 316 S.W.3d at 657. “The State argue[d] that laboratory reports [were] not subject to the Confrontation Clause because they simply document procedures and the results of those procedures.” Cuadros-Fernandez, 316 S.W.3d at 658. Finding the DNA report to be testimonial, the Texas Court of Appeals ruled that the Confrontation Clause had been violated.
The Texas Court of Appeals found that Kwist knew that she was preparing the report for trial, she read the investigating detective’s notes stating that her findings would be reported to the district attorney and notes expressing the detective’s theory of the crime, she knew Cuadros-Fernandez was the suspect, and “[t]he report itself was the only evidence presented of the DNA results and was presented as a substitute for in-person testimony concerning the DNA testing.” Cuadros-Fernandez, 316 S.W.3d at 658. As in Melendez-Diaz, the Texas Court of Appeals rejected the State’s argument and held that the “confrontation of the analyst is necessary to permit, defendants to expose analysts who may be incompetent or even dishonest. [Melendez-Diaz,] at 2536-37. Moreover, ‘the prospect of confrontation will deter fraudulent analysis in-the first place.’ Id. at. 2537.” Cuadros-Fernandez, 316 S.W.3d at 658.

*392
Analysis

Ware argues in his brief that his case is similar to . Cuadros-Fernandez because like Kriek, neither DellaManna nor Kok-oszka was “the analyst who actually performed the DNA testing,” (Ware’s brief, at p. 31.) Therefore, Ware urges this Court to follow the rationale set forth in Cuadros-Fernandez. Ware asserts:
“The reports that Mr.' DellaManna relied upon to reach his conclusions were used to do precisely what a witness does on direct examination. Without the results of those reports, Mr. DellaManna could not have madé the physical connection between the genetic profiles found in the rape kits and the genetic profile of Mr. Ware.
[[Image here]]
' “,. Without the results generated by Orchid .,’ Mr. DellaManna would have had nothing to compare to Mr. Ware’s profile and could not have identified him-, or anyone for that matter, as a suspect.”
(Ware’s brief, at pp. 32, 33-34.)
Ware contends that Kokoszka’s testimony did not cure the alleged constitutional error. Kokoszka testified that he supervised the laboratory technicians and that his “responsibility, was to review the. data generated by [laboratory technicians]. in the laboratory.” (R. 714.) Ware argues that, even though
“[Kokoszka] was employed with Orchid ... at the time of the testing, Dr. Kok-oszka nevertheless was still not the analyst who performed the tests. Similar to the testifying, expert in Cuadros-Fer-nandez, he had a supervisory role and was a custodian of the records, but he was not the analyst. Dr. Kokoszka’s ‘responsibility was to review the data generated by others in the laboratory.’ (R. at 714.)”
(Ware’s brief, at pp. 34-35.)
The State responds on appeal by arguing that the DNA profile report was not testimonial and that' the Texas Court of Appeals in Cuadros-Femandez misconstrued the holding in' Melendez-Diaz and, thus, accoi-ding to the State, Cuhdros-Fer-nandez cannot be cited as persuasive authority in Ware’s case. The State asserts that the Texas Court reached
“its conclusion that [the evidence was] testimonial based on certain factors indicating that the preparer knew that it related to a criminal case and thus that she might be asked to testify at trial. This is simply not the holding in Melendez-Diaz. Because the report in Cuad-ros-Femandez was not an affidavit or another type of formalized testimonial material, it is not testimonial under Melendez-Diaz, and the conclusion of the Texas court is incorrect.”
(State’s brief, at p. 32.) The State relies on the fact that in Melendez-Diaz Justice Thomas, who wrote a concurring opinion, provided the majority’s fifth vote. As previously stated, Justice Thomas concurred in Melendez-Diaz, asserting that he joined the Court’s opinion only “because, .the documents. at issue in this case, ‘are quite plainly affidavits,’ [Melendez-Diaz, 129 S.Ct] at. 2532. As such, they ‘fall within the core class of testimonial statements’ governed- by the Confrontation .Clause. Ibid. (internal quotation marks omitted).” Melendez-Diaz, 557 U.S. at 330, 129 S.Ct. at 2543 (Thomas, J., concurring). Justice Thomas’s concurring opinion was necessary to obtain a majority, and, according to the State, “means that the actual holding of the case is that the confrontation clause pertains only, to the statements in the particular forms- included in Justice Thomas’s list.” (State’s brief> at p. 32.) The “list” is *393 a reference to Justice Thomas’s special writings in White v. Illinois, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), Giles v. California, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), and Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
In his special writing in White, Justice Thomas, joined by Justice Scalia, stated that the meaning of “witnesses against the defendant” was the critical inquiry in understanding the relationship between the Confrontation Clause and the rule against hearsay. Justice Thomas noted, that 5 J. Wigmore, Evidence § 1397, p. 159 (J. Chadbourn rev.1974), and Justice Harlan in Dutton v. Evans, 400 U.S. 74 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (Harlan, J., concurring in result), construed the phrase “witnesses against the defendant” in the strictest sense. “The strictest reading would be to construe the phrase ‘witnesses against him’ to confer on a defendant the right to confront and cross-examine only those witnesses who actually appear and testify at trial.” White v. Illinois, 502 U.S. at 359 (Thomas, J., concurring in part and concurring in the judgment). Justice Thomas opined that the Wigmore-Harlan view creates “tension with much of the apparent history' surrounding the evolution of the right of confrontation at common law and with a long line of this Court’s precedent.... For those reasons, the pure Wigmore-Harlan reading may be an improper construction of the Confrontation Clause.” White, 502 U.S. at 360 (Thomas, J., concurring in part arid concurring in the judgment). Justice Thomas opined in White that “[rjelevant historical sources and our own earlier decisions ... suggest that a narrower réading of the [Confrontation] Clause than the one given to it since 1980 may well be correct.” White, 502 U.S. at 361 (Thomas, J., concurring in part and concurring in the judgment). A more narrow reading of the . Confrontation Clause is that “[t]he. federal constitutional right of confrontation extends to any witness who actually testifies at trial, but the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, pri- or testimony, or confessions.” White, 502 U.S. at 365 (Thomas, J., concurring in part and concurring in the judgment). We will not detail the entire discussion here, other than to acknowledge the historical origin of the Confrontation Clause as recited by Justice Thomas:
“In 16th-century England, magistrates interrogated thé prisoner, áccomplices, and others prior to trial. These interrogations were ‘intended only for the information of the court. The prisoner had no right to be, and probably never was, present.’ i J. Stephen, A History of the Criminal Law of England 221 (1883). At the trial itself, ‘proof was usually given by reading depositions, confessions of accomplices, letters, and the like; and this occasioned frequent demands by the prisoner to have his “accusers,” ie., the witnesses against him, brought before him face to face....’ Id., at 326. See also 5 [J.] Wigmore, [Evidence ] § 1364, at 13 [ (J. Chadbourn rev. 1974) ] (‘[Tjhere was ... no appreciation at a)l of the necessity of calling a person to the stand as a witness’; rather, it was common practice, to obtain ‘information by consulting informed persons not called into court’); 9 W. Holdsworth, History of English Law 227-229 (3d ed. 1944). The infamous trial of Sir Walter Raleigh on charges of treason in 1603 in which the Crown’s primary evidence against him was the confession of an alleged co-conspirator *394 (the confession was repudiated before trial and probably had been obtained by torture) is a well-known example of this feature of English criminal procedure. See Pollitt, The Right of Confrontation: Its History and Modern Dress, 8 J.Pub.L. 381, 388-389 (1959); 1 Stephen, supra, at 333-336; 9 Holdsworth, supra, at 216-217, 226-228.
“Apparently in response to such abuses, a common-law right of confrontation began to develop in England during the late 16th and early 17th centuries. 5 Wigmore, supra, § 1364, at 23; Pollitt, supra, at 389-390. Justice Story believed that the Sixth Amendment codified some of this common law, 3 J. Story, Commentaries on the Constitution of the United States 662 (1833), and this Court previously has recognized the common-law origins of the right, see Salinger v. United States, 272 U.S. 542, 548 (1926) (‘The right of confrontation did not originate with the provision in the Sixth Amendment, but was a common-law right having recognized exceptions’). The Court consistently has indicated that the primary purpose of the Clause was to prevent the abuses that had occurred in England. See Mattox v. United States, 156 U.S. 237, 242 (1895) (‘The primary object of the [Confrontation Clause] was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil' cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness ...’); California v. Green, 399 U.S. [149], at 156 [(1970)] (‘It is sufficient to note that the particular vice that gave impetus to the confrontation claim was the practice of trying defendants on ‘evidence’ which consisted solely of ex parte affidavits or depositions secured by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact’); id., at 179 (Harlan, J., concurring) (‘From the scant information available it may tentatively be concluded that the Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trials by anonymous accusers, and absentee witnesses’); Dutton v. Evans, 400 U.S. [74], at 94 [(1970)] (Harlan, J., concurring in result) (the ‘paradigmatic evil the Confrontation Clause was aimed at’ was ‘trial by affidavit’).”
White, 502 U.S. at 361-62 (Thomas, J., concurring in part and concurring in the judgment). Justice Thomas concluded that
“[I]t is possible to interpret the Confrontation Clause along the lines suggested by the United States in a manner that is faithful to both the provision’s text and history. One possible formulation is as follows: The federal constitutional right of confrontation extends to any witness who actually testifies at trial, but the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions. It was this discrete category of testimonial materials that was historically, abused by prosecutors as a means of depriving criminal defendants of the benefit of the adversary process, see, e.g., Mattox v. United States, 156 U.S. [237], at 242-243 [(1895),] and under this approach, the Confrontation Clause would not be construed to extend beyond the historical evil to which it was directed.
“Such an approach would be consistent with the vast majority of our cases,. *395 since virtually all of them decided before Ohio v. Roberts [, 448 U.S. 56 (1980) ]; involved prior testimony or confessions, exactly the type of formalized testimonial evidence that lies at the core of the Confrontation Clause’s concern.”
White, 502 U.S. at 365 (Thomas, J., concurring in part and concurring in the judgment) (emphasis added; footnote omitted).
In Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), Justice Thomas dissented from the decision as it concerned Hammon v. Indiana, No. 05-5705, which case was consolidated with and decided with Davis. Justice Thomas adhered to his view espoused in White and acknowledged that some encounters with police are sufficiently formalized in order to be testimonial in nature. He reiterated his view as follows:
“[T]he statements regulated by the Confrontation Clause must include ‘extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.’ White, supra, at 365 (opinion of THOMAS, J.). Affidavits, depositions, and prior testimony are, by their very nature, taken through a formalized process. Likewise, confessions, when extracted by police in a formal manner, carry sufficient indicia of solemnity to constitute formalized statements and, accordingly, bear a ‘striking resemblance,’ Crawford, supra, at 52 to the examinations of the accused and accusers under the Marian[7] statutes. See generally [J.] Langbein, [The Origins of Adversary Criminal Trial 41] at 21-34 [(2003)].”
Davis v. Washington, 547 U.S. at 836-37.
Again in Giles v. California, Justice Thomas wrote specially, adhering to the views espoused in his special writings in White and Davis.[8]
The question before this Court, as it was in Cuadros-Fernandez, is whether the DNA profile report in this case, although not in the form of an affidavit, is testimonial in nature. In answering this question in the negative, this Court finds persuasive the rationale and holding in United States v. Magyari, 63 M.J. 123 *396 (C.A.A.F.2006). The decisipn in Magyari is not binding on this Court and has no precedential value because it is not an opinion of the Alabama Supreme .Court. However, even though we are not relying on it for its precedential value, we agree with the analysis in Magyari addressing the issue whether evidence is testimonial in nature for purposes of the Confrontation Clause analysis and incorporate its language on that issue; quoted below, in this opinion, which will have précedential effect. We also acknowledge that Ma-gyari was decided before Melen&ez-Diaz. This, however, is of no consequence because we agree with the State’s argument that the Melendez-Diaz definition of testimonial was limited to formalized testimonial materials, be., affidavits. See Melendez-Diaz, 557 U.S. at 329-31, 129 S.Ct. at 2543 (Thomas, J., concurring). Therefore, we do not believe the decision in Melendez-Diaz affects the Magyari decision. Thus, the United States Supreme Court has not specifically addressed whether a laboratory technician’s routine data entries recorded in the form of a report, rather than in the form of an affidavit, is testimonial in nature for purposes of the Confrontation Clause.
Although the facts .in Magyari are unique,- they, are sufficiently similar- to those here. Magyari, a petty officer in the Navy, was randomly chosen for drug screening. Magyari submitted a urine sample; In lieu of his name, the sample was assigned a laboratory identification number' and then tested along with 200 other urine samples. “Between receipt of the .sample and release of the test results, approximately twenty lab personnel handled and/or tested [Magyari’s] sample.” Magyari, 63 M.J. at 124. Magyari’s sample “tested positive for methamphetamine.” Id. He was “convicted of wrongful use of methamphetamine, a schedule III controlled substance, in violation of Article 112(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912(a) (2000).” Id. His conviction was affirmed by the United States Navy-Marine Corps Court of Criminal Appeals in an unpublished opinion. See United States v. Magyari, No. NMCCA 9801499, (NM.Ct.Crim.App.2000). Magyari petitioned and the United States Armed Forces granted review of the following issue:
“WHETHER, IN LIGHT OF CRAWFORD v. WASHINGTON, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), [Magyari] WAS DENIED HIS SIXTH .AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WHERE THE GOVERNMENT’S CASE CONSISTED SOLELY OF APPELLANT’S POSITIVE URINALYSIS.”

Id.

“The Government called four witnesses to introduce the evidence contained in the lab report. The Government called three witnesses stationed at COMSUBPAC[9] in Hawaii, who were involved in the initial collection of [Ma-gyari’s] urine sample. These witnesses included: Sonar Technician Chief Michael S. Szymonik, the urinalysis coordi-natór, Chief Operations Specialist Steve Hapeman, the designated urinalysis .coordinator at the time of [Magyari’s] 'testing, and Fire Control -Technician Chief David R. Chadwick, who observed [Magyari] fill his sample bottle in the men’s head. One witness was called from the Navy Drug Screening Laboratory in San Diego, Mr. Robert J. Czar-ny, a civilian quality assurance officer. Mr. Czarny testified about how urine samples are handled and how results are *397 generated at the Laboratory. Mr. Czar-ny signed off on [Magyari’s] report upon its release, but he was not personally involved in the handling or testing of [Magyari’s] sample. The Government did not call any of the lab technicians at the Navy Drug Screening Laboratory whose names appeared on the lab report and chain of custody documents, and who reviewed [Magyari’s] paperwork, tested his urine sample, or prepared the lab report.
“[Magyari’s] defense' counsel cross-examined Mr. Czarny, but did not call any of the other lab personnel who handled or tested [Magyari’s] urine sample. [Magyari] now argues that his constitutional right to confront the witnesses against him was violated and that' any statements contained in the lab report that indicated his urine tested positive for the presence of methamphetamine were inadmissible testimonial hearsay and could not be used ■ against him at trial.
“DISCUSSION
“....
“The Confrontation Clause of the Sixth Amendment states that ‘In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....’ U.S. Const. amend. VI. In Crawford v. Washington, the Supreme Court held that in order for the prosecution to introduce. ‘testimonial’ out-of-court statements into evidence against an accused, the Confrontation Clause requires that the witness who made the statement be unavailable, and that the accused have had a prior opportunity to cross-examine the witness. 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
“Prior to Crawford, the admissibility of out-of-court statements was controlled by Ohio v. Roberts [, 448 U.S. 56 (1980) ]. Under Roberts, the statements of an out-of-court witness could be admitted against an accused if the statements carried adequate indicia of reliability. Roberts, 448 U.S. at 66, 100 S.Ct. 2531.
“The Crawford Court departed from the Roberts framework for admitting out-of-court hearsay statements, and transformed the inquiry to one hinging on whether the out-of-court statement comes within the scope of the Sixth Amendment'’because it ‘bears testimony’ against an accused. Crawford, 541 U.S. at 51, 124 S.Ct. 1354. ‘ “The iynchpin of the Crawford decision ... is its distinction between testimonial and nontesti-monial hearsay...."' United States v, Scheurer, 62 M.J. 100, 104-05 (C.A.A.F.2005) (quoting United States v. Hendricks, 395 F.3d 173, 179 (3rd Cir.2005)). Where nontestimonial statements are at issue, the statements do not fall within Crawford’s scope and may be exempted from Confrontation Clause scrutiny altogether. Crawford, 541 U.S. at 68, 124 S.Ct. 1354.
“However, the Qrawford Court did .not ‘spell out a comprehensive definition of “testimonial,” ’ leaving to lower courts the responsibility to determine which statements qualify as ‘testimonial’ and fall within its scope. Id. Nevertheless, the Court identified three forms of ‘core’ testimonial evidence. They include: (1) ex parte in-court testimony; (2) extrajudicial statements in formalized trial materials; and (3) statements made under circumstances that would cause a reasonable witness to believe they could be used at, trial. Id. at 51-52, 124 S.Ct. 1354, Further, the Court identified, examples of testimonial hearsay, including ‘prior testimony at a preliminary hearing, before a grand jury, or at a former *398 trial; and ... police interrogations.’ Id. at 68, 124 S.Ct. 1354.
“In addition, the Crawford Court linked its analysis to the legal policies underpinning the right to confrontation. It noted that the focus of the Confrontation Clause is to protect criminal defendants from prosecutorial abuse and the ‘[i]nvolvement of government officials in the production of testimony with an eye towards trial.’ Id. at 56, 124 S.Ct. 1354. Thus, the application of Crawford not only depends on the meaning of ‘testimonial,’ but on the circumstances and context in which out-of-court statements are generated, and whether the out-of-court statements were made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial by the government. Id. at 52, 124 S.Ct. 1354.
“The question before this Court is whether the data entries in [Magyari’s] urinalysis lab report made by the Navy Drug Screening Laboratory technicians constituted testimonial statements....
“[Magyari] contends that the data recorded in the lab reports are statements by the lab technicians and that these statements fall under the third category of core testimonial evidence identified in Crawford because the lab technicians would have anticipated that the lab report would be used against him at trial. The Government argues that the lab reports are business records and therefore are by definition nontestimonial in nature and fall outside Crawford’s scope.
“On the one hand, technicians working in government laboratories screening and testing urine samples are surely aware that a sample testing positive for a controlled substance may be used to prosecute the provider of the sample. On the other hand, not all urine samples test positive, and not all positive results end in prosecution. The record in this case reflects that the lab technicians work with batches of urine samples containing about 200 samples each. The technicians do not equate a particular sample with a particular person; instead, they assign identification numbers to every sample. The vast majority of samples analyzed do not test positive for illegal substances. The lab technicians handling samples work in a nonadver-sarial environment, where they conduct routine series of tests requiring virtually no discretionary judgments. The lab technicians handling [Magyari’s] particular sample had no reason to suspect him of wrongdoing, and no reason to anticipate that his sample, out of all the 200 samples in the batch, would test positive and be used at a trial.
“In this context, the better view is that these lab technicians were not engaged in a law enforcement function, a search for evidence in anticipation of prosecution or trial. Rather, their data entries were ‘simply a routine, objective cataloging of an unambiguous factual matter.’ United States v. Bahena-Cardenas, 411 F.3d 1067, 1075 (9th Cir.2005). See also State v. Dedman, 2004-NMSC-37, ¶ 30, 136 N.M. 561, 569, 102 P.3d 628, 636 (finding that a blood alcohol report was prepared in a nonadver-sarial setting). Because the lab technicians were merely cataloging the results of routine tests, the technicians could not reasonably expect their data entries would ‘bear testimony’ against [Ma-gyari] at his court-martial. See Commonwealth v. Verde, 444 Mass. 279, 827 N.E.2d 701, 704 (2005) (drug tests are nontestimonial if they are ‘mere[ ] records of primary fact, with no judgment or discretion on the part of the analysts’). This conclusion is consistent with the Crawford Court’s policy con *399 cerns that might arise where government officers are involved ‘in the production of testimony with an eye toward trial’ and where there is ‘unique potential for prosecutorial abuse’ and overreaching. Crawford, 541 U.S. at 56, 124 S.Ct. 1354.
“Approximately twenty different people conducted tests, made clerical data notations in [Magyari’s] records, or at one time had physical custody of [Ma-gyari’s] urine sample while it was at the Navy Drug Screening Laboratory. There is no indication that any of these individuals had reason, or weré under pressure, to reach a particular conclusion about [Magyari’s] sample, number S9802132117, or that they had reason to distinguish sample number S9802132117 from the other thousands of samples routinely screened and tested by batch at the laboratory.
“To be clear, we reach this conclusion based on the facts of this case. The Government’s contention that lab reports are inherently not testimonial because they are business and public records goes too far. For sure, [Magyari’s] lab report is a business record. Military Rule of Evidence (M.R.E.) 803(6) implies that lab reports are included in the definition of business records because forensic laboratories are impartial examining centers and a -laboratory report is a record of ‘regularly conducted’ activity. At trial, the Government elicited' ample testimony verifying that [Magyari’s] report was completed in the normal course of the Navy Drug Screening Laboratory’s business. Further, lab results, DNA analyses, and hospital records, are oftentimes prepared in the course of routine, ‘regularly conducted’ business.
“Nonetheless, the same types of records may also be prepared at the behest of law enforcement in anticipation of a prosecution)-which may make the reports testimonial. See State v. Norman, 203 Or.App, 1, 125 P.3d 15, 19 (2005) (concluding that the Sixth Amendment was not implicated where technicians did not function ‘as the proxy of the police investigation concerning [the] defendant’). Thus, lab results or other types of routine records may become testimonial where a defendant is already under investigation, and where the testing is initiated by the prosecution to discover incriminating evidence. For example, cross-examination' may be appropriate where a particular defendant is accused of rape and law enforcement conducts and seeks to admit the results from a blood or DNA test. See People v. Rogers, 8 A.D.3d 888, 780 N.Y.S.2d 393, 397 (N.Y.App.Div.2004). Cross-examination may also be necessary where a suspect is believed to have operated a vehicle under th¿ influence of drugs or alcohol and a record or affidavit is prepared by hospital personnel for the prosecution’s use at trial. See Las Vegas v. Walsh, 120 Nev. 392, 91 P.3d 591, 595 (2004), modified by 100 P.3d 658 (Nev.2004). But these factors are not at play in the case addressed today and we need not and do not determine in what other contexts Crawford might apply.”
Magyari, 63 M.J. at 125-128 (footnote omitted; emphasis added). Based on the above analysis, the Magyari court determined that “the data entries in the lab report are not testimonial under Crawford,” Magyari, 63 M.J. at 128.[10]
*400 “[T]he principal evil the Confrontation Clause was, designed to address as reflected in both Crawford and Davis ... was and is government officials eliciting or receiving solely ‘accusatory statements’ from third parties. All of the-historical discussion oí,Crawford is in accord,” Michael H. Graham, Crawford/Davis “Testimonial”: Interpreted, Removing the Clutter, 62 U. Miami L.Rev. 811, 829 (2008), citing Crawford, 541 U.S. at 70. Moreover, “[t]he Confrontation Clause should not be concerned with a declarant’s out-of-court statement that is unavailable to be cross-examined at trial asserting only that a-crime was- committed, i.e., corpus delicti. The Confrontation Clause should be concerned solely with the ‘identification’ of the. accused as having committed a crime.” Graham, 62 U. Miami L.Rev. 811, 829 (2008). In these regards, the analysis in Magyari is appropriate in Ware’s case. Not all the DNA profiles recorded by the Orchid laboratory technicians from rape kits result in a prosecution. The technicians perform a great .number of identical tests every day. Under this circumstance, it is apparent that, if called to testify, an Orchid technician would have no independent recollection of any specific test and could offer nothing beyond his or her assertions that the presence of their initials following certain tests reflected that the testing protocol was followed. The Orchid technicians did .not associate the DNA extract to any particular person. The DNA donor was unknown. Thus, the atmosphere could not be adversarial to Ware because, as stated above, the DNA donor was unknown. Also, the tests were routine and protocol was followed in conducting them. The Orchid laboratory technicians did not make any discretionary judgments. They merely recorded the data extracted from their testing. The laboratory technicians did not suspect Ware of any wrongdoing because his identity was unknown, and their. DNA profile did not alert the technicians to the identity of-the donor. The Orchid laboratory technicians could not.¡procure evidence against Ware until his -identity was known. Ware’s identity as the DNA donor was not established until DellaManna matched the Orchid profile with Ware’s CODIS profile.. Moreover, multiple . Orchid laboratory: technicians performed tests on-the rape kit. The Orchid-technicians would have had to have had Ware’s DNA profile before testing and then they would have had to conspire with one another in order to create a DNA profile to match Ware’s. Therefore,, like the technicians in Magyari, the Orchid laboratory technicians had -no accusatory information regarding Ware, they were not engaged in a law-enforcement function.in anticipation of a prosecution, and they ■ were never aware .of the DNA donor’s identity. Rather, to reiterate,
“their data entries were ‘simply a routine, objective cataloging of an unambiguous factual matter.’ United States v. Bahena-Cardenas, 411 F.3d 1067, 1075 (9th Cir.2005).... Because the lab technicians, .were merely cataloging the results of routine tests, the technicians could not reasonably expect them data entries would ‘bear testimony’ against [Ware]_ This conclusion is consistent with the Crawford Court’s. policy concerns that might arise where, government officers are involved ‘in the production of testimony with an eye toward .trial’ and where there is ‘unique potential for prosecutorial abuse’ and overreaching. Crawford, 541 U.S. at 56, 124 S.Ct. 1354.”
Magyari, 63 M.J. at 126-27.
Regarding the Orchid laboratory technicians, as in Magyari, we can see no potential for prosecutorial abuse by their absence from trial. Under these eircum- *401 stances there was no potential for prose-cutorial influence or abuse. For all of these reasons, the test and data entries of the Orchid laboratory technicians cannot be considered evidence that bears witness against Ware. Their work product is thus nontestimonial.
The trial court .properly overruled Ware’s objection made on Confrontation-Clause grounds and properly admitted the DNA profile report' during Kokoszka’s testimony, and the trial court properly allowed DellaManna to use the profile while testifying.
II.
Ware contends, as he did at trial, that he was denied due process when Orchid consumed the “raw DNA,” thereby leaving no material for him to have retested. Ware appears to actually be claiming that his inability to have his own expert extract DNA from a vaginal swab contained in L.M.’s rape kit rendered his trial fundamentally unfair.
In this case, the rápe kit contained two[11] vaginal swabs taken from L.M. at the hospital after she was raped. A chemical process[12] was used by Orchid laboratory technicians to remove DNA from these swabs — the DNA that is separated from the swabs is called the “DNA extract.” (R. 594.) The DNA extract is also called “raw DNA.” (R. 596.) The “raw” DNA is tested to produce a DNA profile. Howev-er, in this ease, in order to extract enough DNA to generate a profile, Orchid had to use all the swabs in L.M.’s rápe kit. (R. 457.) DellaManna testified that in some cases, such as Ware’s, the alternative to using all the swabs would be to have no DNA for testing. (R. 614.) Thus, there were no swabs available to Ware for independent testing. However, the DNA. extract was available and was in the possession of the DFS. (R. 447.) Moreover, DellaManna testified that: “It’s common practice to start with the extract ... to generate the profile.” (R. 596.)
According to Ware, because his conviction rested solely on ■ DNA evidence, his inability to have the sample independently tested was prejudicial to his defense and was not-harmless error. (Ware was granted $5,000 to hire an expert.) (R. 54-55.) He- specifically asserts that, because “there was no DNA left to. retest,”- he was denied the “opportunity to -discredit the forensic analysis.” (Ware’s brief, at p. 42.)
Ware argues that the “[ejvidence at trial showed that' a strong possibility existed that there was an error in the testing of the DNA because DNA evidence indicated that Mr. Ware was in one place and physical records indicated that he was in another” at the time L.M. was-raped. (Ware’s brief, at p. 42.) Here, Ware is referring to his alibi-defense. He contended that he was incarcerated in the Autauga County jail serving as the jail cook when L.M. was raped. There was no dispute that Ware was supposed to be incarcerated in the jail at the time of L.M.’s rape. - However, there was a dispute concerning the constraints placed on Ware in his capacity as the jail cook.' The jury heard evidence from the State suggesting that Ware was treated as - a jail trusty who was often *402 granted unsupervised leave. One location where Ware allegedly spent unsupervised leave was at an address four blocks from where L.M. was raped.
Additionally, Ware argues, “[h]aving a sample available for retesting was especially important in the case at hand due to the inconsistencies in testing the two rape kits in the crimes for which Mr. Ware was charged.” (Ware’s brief, at p. 41.) Here, Ware is referring the DNA profile in P.D.’s case, which was not as strong a match as in L.M.’s case. We note that the vaginal swabs taken in L.M.’s case and the oral swab taken from P.D. were completely unrelated. That the oral swab did not produce a “match” with a CODIS profile as did the vaginal swab, does not mean the testing was “inconsistent.” The conclusions had nothing to do with the testing.
Ware relies on Ex parte Gingo, 605 So.2d 1237, 1240 (Ala.1992), to. support his claim.
“The Alabama Supreme Court, in Ex parte Gingo, 605 So.2d 1237 (Ala.1992), adopted the United States Supreme Court’s position in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the allegations that the state failed to preserve evidence potentially useful to the defense:
“‘“[UJnless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.” Youngblood, 488 U.S. at 58, 109 S.Ct. at 337. “The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police’s knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.” Youngblood, 488 U.S. at 57 (footnote), 109 S.Ct. at 337 (footnote), citing Na-pue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).’
“605 So.2d at 1240-41. Gingo additionally recognized that a defendant’s right to due process can be violated when the loss or destruction is of evidence so critical to the defense that its loss or destruction makes the trial fundamentally unfair. Id. (citing Youngblood, 488 U.S. at 67, 109 S.Ct. at 342).”
See Ex parte Gingo, 605 So.2d 1237, 1240 (Ala.1992). Although the legal principal in Gingo applies in Ware’s case, we note the facts in Gingo are distinguishable from those here. Concisely, in Gingo evidence remaining following tests conducted by the Environmental Protection Agency (“the EPA”) was thrown away because the EPA did not know it should be retained for use by the defendant in a criminal case. Here, it was necessary to use all the vaginal swabs in L.M.’s rape kit to obtain enough DNA for testing. Had all the swabs not been used, there would not have been any DNA extract available for testing.
Ware has not shown bad faith by the police. L.M.’s rape kit was sent to Orchid for testing, along with several other “cold-case” rape kits. At the time the kit was tested, Ware was not a suspect, and there was no assurance that any of the rapist’s DNA would be recovered from the rape kit. Thus, the police had no knowledge regarding any possible exculpatory value of the evidence at the time it was destroyed. Therefore, the destruction of the swabs was not the result of bad faith on the part of the police and the consumption of the swabs does not constitute a denial of due process of law.
Ware has not shown that the destruction of the swabs was the loss of evidence so critical to the defense that its loss or destruction made his trial fundamentally unfair. See Arizona v. Youngblood, 488 U.S. *403 51, 67, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The important evidence in this case was the DNA extract. The swabs were the instruments used at the hospital hopefully to collect DNA as part of a rape kit. The rape kit was kept pursuant to a chain of custody that was not challenged. When Orchid received the rape kit, a chemical was used to elute DNA from the cotton swab.
As stated in Part I of the opinion, the DNA testing in this case followed .Orchid’s standard operating procedures and the laboratory supervisor reviewed the procedures. The unavoidable consumption of the swabs, leaving Ware unable to.independently extract DNA from one of the swabs, goes to the weight of the evidence. See Holdren v. Legursky, 16 F.3d 57, 60 (4th Cir.1994), cert. denied, 513 U.S. 831, 115 S.Ct. 106, 130 L.Ed.2d 53 (1994) (any failure by treating physician to collect samples from a rape victim for subsequent testing went to the weight of the evidence rather than its admissibility). Moreover, there is no guarantee that, had Ware been given a swab for independent testing, it would have contained DNA. Additionally, DellaManna testified that after Orchid tested the DNA extract, the remaining DNA extract was retained and kept at the DFS. Ware could have tested the DNA extract using his own expert.
III.
Ware contends that the trial court erred in denying his motions to dismiss based on the denial of his request for a speedy trial.[13] Ware claims that he asserted his right, that the State caused delays, and that material witnesses were lost due to circumstances beyond Ware’s control.
In determining whether a defendant has been denied his constitutional right to a speedy trial, we apply the test established by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in which the following four factors are -considered: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant’s assertion of his or her right to a speedy trial; and (4) the prejudice to the defendant.
In Ex parte Walker, 928 So.2d 259, 263 (Ala.2005), the Alabama Supreme Court stated: “ ‘A single factor is not necessarily determinative, because this is a “balancing test, in which the conduct of both the prosecution and the defense are weighed.’” Ex parte Clopton, 656 So.2d [1243] at 1245 [ (Ala.1986) ] (quoting Barker, 407 U.S. at 530). We examine 'each factor in turn.”

Length of delay.

“In Alabama, ‘[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant — whichever is earlier — -to the date of the trial.’ Roberson[ v. State], 864 So.2d [379] at 394. Cf. § 15-3-7, Ala.Code 1975 (‘A prosecution may be commenced within the meaning of this chapter by finding an indictment, the issuing of a warrant or by binding over the offender.’); Rule 2.1, Ala. R.Crim. P. (‘All criminal proceedings shall be commenced either by indictment or by complaint.’).”
Ex parte Walker, 928 So.2d at 264. Here, Ware was indicted on December 16, 2005, and the writ of arrest was issued on December 21, 2005. Trial began on June 9, 2008 — a delay of 30 months. A 30-month delay is presumptively prejudicial. See State v. Van Wooten, 952 So.2d 1176 (Ala.Crim.App.2006) (29-month delay was presumptively prejudicial); Vincent v. State, *404 607 So.2d 1290 (Ala.Crim.App.1992) (31-month delay was presumptively prejudicial). Cf. State v. Johnson, 900 So.2d 482 (Ala.Crim.App.2004) (28-month delay was not presumptively prejudicial); Payne v. State, 683 So.2d 440 (Ala.Crim.App.1995) (25-month delay was not, presumptively prejudicial).
Reason for delay. The following dates, are taken from the time line presented by the State in its brief at pages 42-45. With the exception of corrections, which have been bracketed (this does not include the brackets placed around “Public Defender”), this timeline represents a correct chronology of relevant events in this case. We adopt the following in its entirety.,
“5/22/06 — [Ware’s] pro se motion for speedy trial filed.
“9/8/06 — At arraignment State is ordered to produce discovery within seven days. (CR. 29; R. 11.)
“9/18/06 — [Ware] files pro se motion for discovery. (CR. 26.)
“9/20/06 — Public .Defender ... files motion for discovery. (CR. 36-37.)
“9/22/06 — [Public defender] files motion to dismiss with. prejudice for failure to comply with order of 9/8/06. (CR. 41.)
“10/5/06 — Discovery provided to [public defender].- (CR. 45; R. 40.)
“10/18/06 — Hearing on motion to dismiss; [public defender] also renews speedy” trial motion; trial court denies both, finding no prejudice; State requests continuance for additional DNA testing; trial court orders testing, offers to continue ease from November trial date to allow for testing. (R. 9-29.) “11/6/06 — At hearing [public defender] renews motion for speedy trial, asks that trial.be set next week, original trial date; trial court, noting that results of DNA testing not yet available, states that case will not be tried in November unless results are received. (R. 30-33.)
“11/9/06 — [Ware] files pro se motion for new counsel. (CR. 48-50.)
“11/13/06 — DNA test results having been received, trial has been set for following week; Defendant himself, still insisting on new counsel, agrees to let [public defender] represent him until he can hire counsel; [public defender] states that he has not had sufficient time to prepare, and in light of this Defendant himself withdraws his motion for speedy trial; [public defender] states that he will file .motion for expenses for DNA expert. (R. 34-51.)
“4/24/07 — Case is presently set for trial in April or May; [public defender] has asked for additional DNA discovery from State and’ requests' continuance, which is granted; State has no objection to discovery but asks that the voluminous documents be viewed at Forensic Sciences office. (R. 53-104.)
“7/[13]/07 — Hearing to consider motion for new counsel and speedy trial filed by [public defender] at [Ware’s] request (CR. 69); [public defender] claims that discovery requested in April was received on July 12th, states that they have not had time to review -material received; [Ware] himself wants another lawyer, wants continuance for trial, now set for 8/6/07, in order to get another lawyer, and withdraws motion for speedy trial; [Ware] told that case will be tried for sure on next trial date, whether [Ware] has another lawyer or represents himself; , [public defender] expi'esses confusion as to whether they are authorized to work on case while [Ware] seeks new lawyer. (R. 105-116.)
“9/4/07 — Pretrial hearing on case that has been set for next week; [Ware] himself asks for continuance to seek lawyer; State has also asked for continuance (reasons not stated); continuance *405 granted; trial set for 11/13/07; [public defender] expresses confusion as to present role in case; [Ware] informed that case-will be tried on 11/13/07, and that if he does not have his own lawyer by then he will represent himself with [public defender] as advisory counsel. (R. 119-125.)
“12/5/07 — State files motion to consolidate case with another similar charge, filed recently, that will involve same DNA evidence; [public defender] agrees to consolidation; case is presently set for trial next week; [public defender] asks for time to locate witnesses on second case; State says it is ready to proceed but will not oppose continuance; case continued to 2/11/08. (R. 127-129.) “2/19/08 — Hearing; mention is made that case has been set for 3/10/08; [public defender] has expressed concerns that work on DNA evidence cannot be completed by then; [public defender] mentions request for raw DNA material, and states that if raw DNA is produced continuance may be sought for independent testing; State says it will be ready on 3/10/08. (R. 131-133.)
“3/10/08 — State has just received from [public defender] [Department of Corrections] documents indicating that [Ware] may have been actually in custody on date of second charge, asks for continuance for time to investigate; continuance on this ground is denied; State also asks for continuance because witness in second case has had stroke; State apparently withdraws motion for continuance and asks that second case be severed; [public defender] objects to severance; [ultimately, as best we can discern from the record, the defense acquiesced to the continuance to avoid severance.] (R. 140-165.)
“6/9/08 — Trial begins; at pretrial hearing State dismisses one count of first ease, dismisses all charges in second case; [public defender] objects to' dismissal of second case; [public defender] states that at 3/10/08 hearing it did not agree to continuance-but only withdrew objection, so as to preserve.speedy trial issue. (R. 167-223.)”
(State’s brief, at pp. 41-45.)
In Ex parte Walker, supra, the Alabama Supreme Court stated:
“The State has the burden,of justifying the delay. See Barker, 407 U.S. at 531; Steeley v. City of Gadsden, 533 So.2d 671, 680 (Ala.Crim.App.1988). Barker recognizes three categories of reasons for delay: (1) deliberate delay, (2) negligent delay, and (3) justified delay. 407 U.S. at 531. Courts assign different weight to different reasons for delay. Deliberate delay is ‘weighted heavily’ against the State. 407 U.S. at 531. Deliberate delay' includes - an ‘attempt to delay the trial in order to hamper the defense’ or ‘“to gain some tactical advantage over (defendants) or to harass them.” ’ 407 U.S. at 531 & n. 32 (quoting United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). Negligent' delay is weighted less heavily" against the State than is deliberate delay. Barker, 407 U.S. at 531; Ex parte Carrell, 565 So.2d [104,] 108 [ (Ala.1990) ]. Justified delay— which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible — is not weighted against the State. Barker, 407 U.S. at 531; Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App.1993) (‘“Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.” ’) (quoting *406 McCallum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981)).”
928 So.2d at 265.
Most of the delay in this case can be attributed to Ware. Approximately 11 months after the indictment was returned, Ware filed a motion for new counsel and withdrew his motion for a speedy trial. (See R. 45-46.) Approximately 16 months following the indictment, Ware requested additional discovery and a continuance. Approximately 19 months following the indictment Ware again asked for a continuance to hire new counsel and again withdrew his speedy-trial request. (See R. 113.) Approximately 21 months following the indictment — ten months before trial— Ware asked for a continuance to obtain new counsel. (See R. 123-24.) Approximately 24 months following the indictment a second rape case was consolidated with the instant case, and Ware asked for a continuance to find witnesses in the second case. Twenty-seven months following the indictment — approximately three months before trial — the State withdrew a previously filed motion to continue and moved to sever the consolidated cases. Ware did not want the cases severed, and ultimately, they were not severed and trial was continued until a later date.[14]
Because Ware has not shown that the State deliberately caused any delay, and because some of the delay in this case is attributable to him, this Barker factor does not weigh against the State.
Assertion of right to speedy trial. Ware filed a pro se motion for a speedy trial on or about May 22, 2006 — approximately five months after the indictment was returned. (CR. 26, R. 30.) Ware did assert his right to a speedy trial on several occasions. “Repeated requests for a speedy trial weigh heavily in favor of an accused.” Kelley v. State, 568 So.2d 405, 410 (Ala.Crim.App.1990). However, he also moved to withdraw his request for a speedy trial and he requested or acquiesced to several continuances. Ware’s last motion to withdraw his request for a speedy trial was made on July 13, 2007— 19 months after the indictment was returned and 11 months before trial. It appears that Ware’s last motion to continue was made on December 5, 2007, and that he acquiesced to additional continuances on February 19, 2008, and on March 10, 2008. The trial began on June 9, 2008. (R. 105-07, 111-12, 123-24). Because Ware moved to withdraw his speedy-trial motion and sought continuances, he “either acquiesced in the delays or suffered only minimal prejudice prior to that date.” Lewis v. State, 469 So.2d 1291, 1294 (Ala.Crim.App.1984), aff'd, 469 So.2d 1301 (Ala.1985). Thus, considering all the motions in this case, we conclude that Ware’s request for a speedy trial does not weigh heavily in his favor.

Prejudice to the defendant.

“A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.... Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.”
Barker, 407 U.S. at 532.
Ware’s speedy-trial clock started in December 2005. Ware was in prison on oth *407 er charges for the entire 30 months before trial. Ware’s claim that he suffered anxiety while awaiting trial is not well taken because he was already in prison following a felony conviction and was well acquainted with the legal process. Also, in this time period, he was surrounded by men who were also in prison and who no doubt understood and could commiserate with Ware concerning his predicament. Events occurring before December 2005, such as the unavailability of a witness because of death, the disappearance of alleged witnesses, and the destruction of records, did not occur within the alleged period of delay and, thus, cannot be blamed on the alleged delay. The delay in this case was not so prejudicial against Ware that he was denied an opportunity for a fair trial.
After considering the Barker factors, we hold that Ware’s right to a speedy trial was not violated.
IV.
Ware contends that the trial court erred in denying his motion for á judgment of acquittal as to the burglary and robbery charge because L.M.’s testimony — that she thought she felt something sharp in Ware’s back pocket — was insufficient to prove beyond a reasonable doubt that Ware was armed with a deadly weapon or a dangerous instrumentality. Ware’s indictments for both offenses charged that he had a “knife or other sharp object” at the time of the offenses. (CR. 15-16.) At the conclusion of all the evidence, Ware moved for a judgment of acquittal for failure to establish a prima facie case of first-degree robbery and first-degree burglary because, he said, the State did not prove that Ware was armed with a deadly weapon or dangerous instrument.
‘With respect to the suffieiency-of-the-evidence claim, it is well settled that ‘ “[i]n determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.”’ Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). ‘.“The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.” ’ Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial, court’s decision.” ’ Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’ Bankston v. State, 358 So.2d 1040, 1042 (Ala.1978).”
Williams v. State, 10 So.3d 1083, 1086 (Ala.Crim.App.2008).

First-degree Robbery

First-degree robbery is defined as follows:
“(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
“(1) Is armed with a deadly weapon or dangerous instrument;
*408 [[Image here]]
§ 13A-8-41, Ala.Code 1975. Section 13A-8-43, Ala.Code 1975, provides, in pertinent part:
“(a) A person commits the crime of robbery in the' third degree if in the course of committing a theft he:
“(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
“(2) Threatens the imminent use of force against the person of the owner or any ‘person present with intent to compel ácquiescencé to the taking of or escaping with the property.”
Moreover, § 13A-8-41(b), Ala.Code 1975, provides that there is a presumption that a robbery defendant was in fact armed during a robbery when the defendant possesses an article “fashioned iñ a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument.”
“(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed.”
§ 13A-8-41(b), Ala.Code 1975.
L.M. testified that the man who attacked her had in his back pocket an instrument that she believed-at the time was a .knife. It was, in any event, an object that L.M. believed could be used to kill her if her attacker desired to do so. This testimony, if believed by the jury, was sufficient to create a rebuttable presumption that Ware was armed with a knife.
Because the: State presented sufficient evidence tó establish a prima facie case of first-degree robbery, the trial court properly submitted the charge of first-degree robbery to the jury. This, along with the other evidence in the- case, was sufficient evidence, if believed by the jury, to allow the jury to find beyond a reasonable doubt that Ware was guilty of first-degree robbery. • Therefore, the trial court did not err. in denying Ware’s motion for a judgment of acquittal and submitting the-case to the jury.

Burglary

⅞ 1993,[15] the time the offense was committed, first-degree burglary included the following definition:
“(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, he or another participant in the crime:
“(1) Is armed with explosives or a deadly weapon.”
The State presented evidence indicating that Ware unlawfully entered L.M.’s house with the intent to commit a rape and/or theft. L.M. testified that the man who attacked her had in his back pocket an instrument that she believed was a knife. It was, in' ¿ny event, an object that L.M. believed could be used to lull her if her attacker desired to do so. This testimony, if believed by the jury, was sufficient to prove first-degree burglary as it was defined in 1993.
For the x-easons set forth above, Ware’s convictions are affirmed.
AFFIRMED.
*409 KELLUM, BURKE, and JOINER, JJ., concur. WINDOM, J., concurs in the result. '

. Ware committed the crime in 1993 before the burglary statute was amended in 2006. Ware was charged under the pre-amended version of the statute. Hardy v. State, 570 So.2d 871 (Ala.Crim.App.1990) (unless otherwise stated in the statute, the law in effect at the time the offense was committed controls the offense).

. L.M. was not asked about her hands,

. A single reference to "Orchid Cellmark Laboratory” in Dallas, Texas was made a page 65 of the transcript. This appears to be an error.

,' A swab is a wooden stick with-a cotton tip on one end. In a rape kit, a swab is used to collect biological material from the victim's vagina after a rape. It is hoped that the rapist’s semen will be a part of the biological material collected on the swab.

.The analyst placed their initials beside the - procedures. Those initials are: JHF, MLM, . JJW, ADM, NRG, and JLK.

. Because James Lee Ware had been convicted of a prior felony, his DNA .was part of the CODIS database. See § 36-18-25, Ala.Code 1975.

7. The Marian statutes were created in England in 1554-1555 by Queen Mary. John Langbein, The Origins of Public Prosecution at Common Law (1973), Faculty Scholarship Series, Paper 539. The Marian statutes consisted of a bail statute and a ... commitment statute. In the most concise terms, under the Marian commitment statute, the justice of the peace gathered information from an accuser and presented it against the accused at trial. The accuser did not have to be present. Id.

. On February 28, 2011, the United States Supreme Court released its decision in Michigan v. Bryant, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). Concisely, the majority held that the statements of a shooting victim, Anthony Covington, made to police as Covington lay dying on the ground of a parking lot were not testimonial because the " 'primary purpose of the interrogation' was ‘to enable police assistance to meet an ongoing emergency,' Davis, 547 U.S., at 822.” Michigan v. Bryant, 562 U.S. at 349, 131 S.Ct. at 1150. Adhering to his previous special writings, Justice Thomas concurred in the judgment, stating:
"Rather than attempting to reconstruct the 'primary purpose’ of the participants, I would consider the extent to which , the interrogation resembles those historical practices that the Confrontation Clause addressed. ... This interrogation bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate. Covington thus did not 'bea[r] testimony’ against [the defendant], Crawford, supra, at 51 and the introduction of his statements at trial did not implicate the Confrontation Clause.”
Michigan v. Bryant, 562 U.S. 344, 131 S.Ct. at 1167.

9. "Commander, Submarine Force, U.S. Pacific Fleet.” Magyari, 63 M.J. at 124.

. The Magyari court went on to consider whether the lab reports were properly admitted as evidence at trial. However, Ware called upon this Court to review only whether his lack of an opportunity to cross-examine the laboratory analyst who actually performed the tests in question violated the Confrontation Clause.

. Typically, there are four swabs in a rape kit. In some cases the hospital uses only two swabs. In other cases, DNA will not be present on all the swabs that were used.

. "And to recover the DNÁ from the swab, you immerse it in a collection of chemicals,' commonly called stain extraction buffer — and proteinase come in a variety of chemicals — to elute the DNA off of the swab into a tube where you have liquid extract. That's what we call the extract. That is remaining. The actual swab is consumed in that process.” (R. 594.)

. Ware did not argue preindictment delay.

. Ultimately, the State dropped the charges involving P.D.

. The first-degree-burglary statute was amended in 2006.