MURDOCK, Justice.
In June 2008, James Lee Ware was convicted of first-degree rape, see Ala. Code 1975, § 13A-6-61(a)(l), first-degree burglary, see Ala.Code 1975, § 13A-7-5(a)(1), and first-degree robbery, see Ala.Code 1975, § 13A-8-41(a)(l). Ware was sentenced as an habitual felony offender to three sentences of life imprisonment, to be served consecutively. Ware appealed his convictions to the Court of Criminal Appeals. The Court of Criminal Appeals affirmed the trial court’s judgment. Ware v. State, 181 So.3d 380 (Ala.Crim.App.2011).
On appeal to the Court of Criminal Appeals, Ware raised the following issues, among others, (1) whether the trial court violated his Sixth Amendment right to confront the witnesses against him when it admitted a DNA-profile[1] report that was *411 based on the work of laboratory technicians who did not testify at trial and (2) whether the trial court erred in denying his motion for a judgment of acquittal on the robbery and burglary charges because, Ware contends, there was not sufficient evidence to prove beyond a reasonable doubt that he was armed with a deadly weapon or a dangerous instrument. This Court granted certiorari review as to those two issues. We affirm as to the first issue and reverse as to the second.

I. Fads

On the night of June 8, 1993, L.M., a graduate student enrolled at the University of Alabama in Tuscaloosa, was asleep in her bed when she was awakened by a man lying on top of her and covering her eyes with a towel and a plastic bag. L.M. testified that, while she was struggling with her attacker, she “felt, [she] thought, something sharp in [the attacker’s] back pocket.” L.M. was forcibly raped two times and was left blindfolded, with her feet bound with an electrical extension cord. Money and a ring had been taken from her house. After the attacker left, L.M. called the police. L.M. was taken to the hospital, where a rape-kit analysis was prepared.[2] Other than the rape kit, no physical evidence was obtained from the crime scene that could be used to identify the rapist.
The case remained unsolved for several years. In 2004 the Alabama Department of Forensic Sciences (“the DFS”) obtained a grant that enabled “cold-case rapes” to be tested for the presence of deoxyribonu-cleic acid (“DNA”), which, if present, could lead to the identification of the rapist. In 2004, the Tuscaloosa Police Department delivered to the DFS the rape kits from several unsolved rape cases, including L.M.’s. Later in 2004,• the DFS delivered those rape kits, including L.M.’s, to Orchid Cellmark Laboratory (“Cellmark”) in Ger-mantown, Maryland.
Cellmark laboratory technicians processed the biological material .taken .from swabs in L.M.’s rape kit, tested the DNA present in that material, and developed a DNA profile of the male whose semen was found on the vaginal swab. The record discloses that as many as six laboratory technicians performed tests on L.M.’s vaginal swabs. Cellmark prepared a three-page DNA-profile report containing a summary description of the tests performed and DNA profiles of L.M. and the as yet unidentified male donor. Cellmark also prepared a “case file” or “case folder” documenting. (1) each of the steps in the process, (2) various review checklists, and (3) machine-generated results in the form of graphs and charts.[3] The DNA-profile report was based on the data documented in the case file.
The DNA-profile report and the case file generated by Cellmark were sent to Angelo DellaManna at the DFS. DellaManna *412 compared the DNA profile sent to him by Cellmark to other known DNA profiles contained in the Combined DNA Index System (“CODIS”), which is a nationwide repository for DNA-specimen information. See Ala.Code 1975, § 36-18-21(1). Della-Manna testified that the DNA profile received from Cellmark matched Ware’s DNA profile in CODIS.[4]
Pursuant to routine procedure at the DFS, once the DNA match was ascertained, the DFS confirmed that the CO-DIS profile under Ware’s name actually was that of Ware. The DFS also took a new DNA sample from Ware’s cheek and confirmed that the DNA profile from Ware’s cheek sample matched the CODIS sample as well as the semen profile from the vaginal swabs taken from L.M. ■
Ware objected to the admission of any documents prepared by Cellmark and to any testimony from DellaManna as to what Cellmark did with respect to L.M.’s rape kit. Ware objected that the use of this evidence violated his Sixth Amendment right to confront and to cross-examine the Cellmark laboratory technicians who performed the tests that formed the basis for the DNA-profile report.
The State also presented testimony from Celimark’s molecular geneticist, Jason E. Kokoszka, Ph.D., who supervised and reviewed the testing and analysis of'L.M.’s case and who signed Cellmark’s DNA-profile report in L.M.’s case. Kokoszka testified that L.M.’s case file was kept in the regular course of business at Cellmark and that he was the custodian of those records.
Kokoszka testified that the case file reflects ■ “all the analyses that occurred in L.M.’s case from start to finish, culminating with the ... review checklists that the person reporting the case and reviewing the case would fill out to show what actually occurred inside the case.” Kokoszka further testified that as the reviewer of all the work done in this case, he had reviewed the “identification of the semen upon the sample which occurred prior to the DNA testing,” and he had reviewed “all the analyses that were performed to ensure that they were performed in accordance with [Cellmark’s standard operating procedures] and also ensured that the conclusions drawn from the data were accurate and appropriate as well.” Kokoszka initialed the review sheets in the case file to reflect that he had reviewed the case, and he stated that his personal review meant that the work was performed “in accordance with the guidelines” that were in place. He stated that “[t]o [his] knowledge there were no errors that occurred during the analysis of the case.”
During the State’s examination of Kok-oszka, the DNA-profile report and the case file were admitted into evidence over Ware’s Confrontation Clause objection. In admitting the report, the trial court.stated:
“I believe that [under] the cases following Crawford [v. Washington, 541, U.S. 36 (2004),] and Crawford [itself], the supervisor of the lab work and that prepared the report, if that person is present to — present and subject to cross-examination, Crawford is satisfied. The Court is going to overrule the objection.”
Other than the DNA evidence, no evidence was presented that would identify the rapist. Ware contends that the DNA match was proven to be erroneous by evidence indicating that he was incarcerated in the Autauga County jail at the time of the rape. The evidence as to Ware’s in *413 carceration is in dispute.[5] In 1993, Ware was incarcerated in the Autauga County-jail and was serving as a jail cook. There was evidence presented indicating that while he was incarcerated Ware was treated as a trusty and was at least occasionally granted unsupervised leave from the jail. There was also evidence indicating that Ware allegedly spent some time at an address four blocks from where L.M. was raped. Thus, the evidence as to Ware’s alibi presented a question for the jury.

II. Confrontation Clause of the Sixth Amendment

A.Standard of Review

‘Where an issue presents a pure question of law, ... this Court’s review is de novo.” Ex parte Peraita, 897 So.2d 1227, 1231 (Ala.2004). Likewise, a trial court’s application of the law to the facts is reviewed de novo. Ex parte Jackson, 886 So.2d 155, 159 (Ala.2004). See also Stewart v. State, 990 So.2d 441, 442 (Ala.Crim.App.2008) (“Where ... an appellate court reviews a trial court’s conclusion of law and its application of law to the facts, it applies a de novo standard of review.”).
B.The Court of Criminal Appeals’ Decision -
Before the Court of Criminal Appeals, Ware contended that the trial court had violated his Sixth Amendment right to confront witnesses against him when it admitted into evidence testimony and reports based on the workproduct of laboratory technicians who did not testify at the trial. Specifically, Ware contended that the DNA-profile report and related evidence is testimonial in nature under the principles set forth in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).
The Court of Criminal Appeals concluded that the DNA-profile report was not “testimonial” because, it reasoned, (1) the report was not in the form of an affidavit, (2) the laboratory technicians were not engaged in an accusatory function, (3) the data entries were “routine,” (4) Ware was not identified as a suspect at the time the tests were performed, and (5) there was no potential for prosecutorial abuse under the circumstances of this case.

C.United States Supreme Court Precedent

The Sixth Amendment of the. United States Constitution provides in part that, “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.... ” In Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597, (1980), the United States Supreme Court held that the Confrontation Clause does not bar admission of an unavailable witness’s statement against a criminal defendant if the statement bears “adequate ‘indicia of reliability.’ ”[6]
In Crawford, the United States Supreme Court overruled Roberts, rejecting the “reliability” standard and holding that the right to .confront witnesses applies to all out-of-court statements that are “testimonial.” 541 U.S. at 68. Although the Crawford Court did not arrive at a comprehensive definition of “testimonial,” it noted that “the principal evil at which the Con *414 frontation Clause was directed was the civil-law mode of criminal procedure,[7] and particularly its use of ex parte examinations as evidence against the accused.” 541 U.S. at 50.
The Crawford Court described the “core” class of statements covered by the Confrontation Clause as follows:
“Various formulations of this core class of ‘testimonial’ statements exist: ‘ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, pri- or testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially’; ‘extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions’; ‘statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.’”
541 U.S. at 51-52 (internal citations omitted). Crawford held that a statement made by the defendant’s wife during police interrogation was testimonial and subject to the Confrontation Clause.
Since Crawford, the Supreme Court has released three decisions addressing the application of the Confrontation Clause t'o forensic-testing evidence. In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the Supreme Court held that a sworn certificate of analysis attesting that certain materials were cocaine was a testimonial statement.[8] The Court in Melendez-Diaz declined to create a forensic-testing exception, and it rejected the argument that the certificate at issue there was not testimonial because it was not “accusatory.”
In Bullcoming v. New Mexico, — U.S. -, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Supreme Court held that the Confrontation Clause applied to an un-sworn forensic-laboratory report certifying the defendant’s blood-alcohol level, where the report was specifically created to serve as evidence in a criminal proceeding and there was an adequate level of formalities in the creation of the report.
In Williams v. Illinois, — U.S. -, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), the United States Supreme Court held, in a plurality opinion,[9] that the Confrontation Clause was not violated where an expert was allowed to offer an opinion based on a *415 DNA-profile report prepared by persons who did not testify and who- were not available for cross-examination. Williams involved a bench trial in which a forensic specialist from the Illinois State Police laboratory testified that she had matched a DNA profile prepared by an outside laboratory to a profile of the defendant prepared by the state’s lab. The outside lab’s DNA report was not admitted into evidence, but the testifying analyst was allowed to refer to the DNA profile as having been produced from the semen sample taken from the victim.
The plurality opinion concluded that the analyst’s testimony was not barred by the Confrontation Clause for two independent reasons, neither of which received the concurrence of a majority of the Court. First, the plurality concluded that the expert’s testimony was not admitted for the truth of the matter asserted but was admitted only to provide a basis for the testifying expert’s opinions.[10] Second, the plurality concluded that the DNA-profile report was not testimonial because its primary purpose was not to accuse the defendant or to create evidence for use at trial, but “for the purpose of finding a rapist who was on the loose.” Williams, — U.S. at -, 132 S.Ct. at 2228. The Williams plurality also noted the inherent reliability of DNA-testing protocols and the difficulties in requiring the prosecution to produce the analysts who actually did the testing.[11]
Justice Thoma,s concurred in the judgment in Williams based on his conclusion that the DNA-profile report “lacked the requisite ‘formality and solemnity to be considered ‘testimonial’ for purposes of the Confrontation Clause.” Williams, — U.S. at -, 132 S.Ct. at 2255 (Thomas, J., concurring in the judgment). Justice Thomas, however, “shar[ed] the dissent’s view of the plurality’s flawed analysis.” Id.
In light of the fractured nature of the decision in Williams, it is not clear how the United States Supreme Court will treat forensic reports under the Confrontation Clause. Justice Kagan concluded her dissenting opinion in Williams as follows:
“[The] clear rule [of Confrontation Clause precedent] is clear no longer.... What comes out of four Justices’ desire to limit Melendez-Diaz and Bullcoming in whatever way possible, combined with one Justice’s one-justice view of those holdings, is — to be frank — who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority.”
— U.S. at -, 132 S.Ct. at 2277 (Kagan, J., dissenting). See also United States v. Pablo, 696 F.3d 1280, 1293 (10th Cir.2012) (noting that, in, light of the divided opinions in Williams, admission of forensic reports over a Confrontation Clause objec *416 tion “is a nuanced legal issue without clearly established bright dine parameters”).[12]

D. Analysis

In light of the foregoing, a case can be made for both sides of the issue whether the DNA-prófile report in this case is “testimonial” under the “holdings” of Melendez-Diaz, Bullcoming, and Williams. The issue is a challenging one. We need not resolve it, however, because we agree with the trial court that, in this case, the Confrontation Clause was satisfied by the testimony of Kokoszka, a Cellmark employee who supervised and reviewed the DNA testing and who signed the DNA-profile report.
The United States Supreme Court has not squarely addressed whether the Confrontation Clause requires in-coúrt testimony from all the analysts who have participated in a set of forensic tests, but Bullcoming and Williams suggest that the answer is “no.” , In Bullcoming, the Supreme Court held:
“[S]urrogate testimony [through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification] does not meet the constitutional requirement. The accused’s right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist.”
— U.S. at -, 131 S.Ct. at 2710.
Justice Sotomayor noted in her special writing in Bullcoming concurring in part that' the analyst who testified was not “a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue.” -— U.S. at -, 131 S.Ct. at 2722 (Sotomayor, J., concurring in part). She also stated that “it would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results.” Id.
Likewise, the dissenting opinion in Williams suggested that the dissenters’ approach to the Confrontation Clause would not require testimony from every person who had participated in the analytical process. The dissent stated:
“But none of our cases — including this one — has presented the question of how many analysts must testify about a given report. (That may suggest that in most cases a lead analyst is readily identifiable.) The problem in the cases ... is that no analyst came forward to testify.”
Williams, — U.S. at -n. 4, 132 S.Ct. at 2273 n. 4 (Kagan, J., dissenting).
We conclude that Kokószka’s testimony in this case satisfied the purpose of the Confrontation Clause. Kokoszka signed the DNA-profile report and initialed each page of Cellmark’s “case file” that was also *417 admitted into. evidence. Kokoszka testified that he was one of the individuals taking responsibility for the work that resulted in the report and that he had reviewed each of the analyses undertaken to determine that they were done according to standard operating procedures and that the conclusions drawn were accurate and appropriate. Kokoszka’s testimony at trial provided Ware with an opportunity to cross-examine Kokoszka about any potential errors or defects'in the testing and analysis, including errors committed by other analysts who had worked on the case. The trial court found that Kokosz-ka’s testimony satisfied the requirements of the Confrontation Clause. We agree.’
Based on the foregoing, we affirm the decision of the Court of Criminal Appeals to the extent that it affirmed Ware’s conviction for first-degree rape and the life sentence imposed on that conviction.

III. Sufficiency of the Evidence

A Standard of Review

“ ‘Appellate courts are limited in reviewing a trial court’s denial of a motion for judgment., of acquittal grounded on insufficiency.’ ‘The standard of review in determining sufficiency of evidence is whether evidence existed at the time [the defendant’s] motion for acquittal was made, from which the jury could by fair inference find the [defendant] guilty.’’ In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State.”
Ex parte Burton, 783 So.2d 887, 890-91 (Ala.2000) (citations omitted). In order to find a defendant guilty, the jury must find that the State proved each and every element of the offense charged beyond a reasonable doubt. See, e.g., Ex parte Brown, 74 So.3d 1039, 1052 (Ala.2011); Goodwin v. State, 728 So.2d 662, 671 (Ala.Crim.App.1998) (“ ‘It is fundamental that in a criminal prosecution the burden is on the state to prove beyond a reasonable doubt each and every element of the offense charged.’” (quoting Hull v. State, 607 So.2d 369, 373 (Ala.Crim.App.1992))).
. B. Analysis
This Court granted certiorari review as to Ware’s assertion that the Court of- Criminal Appeals’ judgment on his burglary and robbery convictions conflicted with Thornton v. State, 883 So.2d 733, 736-37 (Ala.Crim.App.2003), which noted that “‘“there must be substantial evidence tending to prove all the elements of the charge.”’” (Quoting Ex parte Mitchell, 723 So.2d 14, 15 (Ala.1998), quoting in turn H. Maddox, Alabama. Rules of Criminal Procedure § 20.1, at 734 (2d ed. 1994).)[13] Actual possession or use of a “deadly weapon” or a “dangerous instrument,” as those terms are defined in the relevant statutes, is an element of both the robbery and burglary offenses of which Ware was convicted. Ware contends that L.M.’s testimony — that she “thought” she felt “something sharp”- in Ware’s back pock *418 et — did not amount to substantial evidence sufficient to prove beyond a reasonable doubt that Ware actually was armed with a “deadly weapon” or a “dangerous instrument” as those terms are statutorily defined.[14]
As to the robbery conviction, Ware was charged and convicted of robbery in the first degree under the following provisions of § 13A-8-41:
“(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
“(1) Is armed with a deadly weapon or dangerous instrument....”
To aid the State in proving the element of being armed with a deadly weapon or dangerous instrument, the statute provides that certain conduct by the defendant constitutes prima facie evidence that the defendant was so armed. Subsection (b) provides:
“(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed.”
(Emphasis added.)
The Code of Alabama defines “deadly weapon” as a “firearm or anything manifestly designed, made, or adapted for the purposes of inflicting death or serious physical injury.” § 13A-1-2(7), Ala.Code 1975 (emphasis added).[15] A “dangerous instrument” is defined as “any instrument, article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is highly capable of causing death or serious physical injury.” § 13A-1-2(5), Ala.Code 1975 (emphasis added).
*419 Subsection (b) addresses two types of conduct by the defendant that (institute prima facie evidence of being armed: (1) possession of an “article used or fashioned in a manner to lead a person reasonably to believe it to be a deadly weapon or dangerous instrument” or (2)' a representation by the defendant that he is so armed.
Ware’s indictment alleged that Ware had in his possession a “knife or other sharp object” at the time the offenses were committed.[16] No knife or other sharp object was found at the scene or introduced into evidence, and there was no evidence indicating that L.M. actually saw a knife or similar object. Nor was there any evidence indicating that Ware made any “verbal or other representation” to L.M. that he was so armed. The only evidence as to whether Ware was armed was L.M.’s testimony that, as she was flailing her arms, she “thought” she felt “something sharp” in Ware’s back pocket. Thus, in the present case, the State sought to meet the requirement for establishing a prima facie case under § 13A-8 — 41(b) by proving that Ware possessed an article that was “used or fashioned in a manner to lead a person reasonably to believe it to be a deadly weapon or dangerous instrument.”
L.M. did not testify that she saw or felt “a knife,” only that while she “was flailing [her] arms around ... [she] felt, [she] thought, something sharp in [Ware’s] back pocket.” L.M. did not testify as to what, exactly, she thought the “something sharp” in Ware’s pocket was, nor did she provide any details regarding what she felt (size, approximate shape, etc.). This testimony, even when viewed in the light most favorable to the State, is not substantial. evidence that would support a finding beyond a reasonable doubt of the “deadly weapon” element of the offense of first-degree robbery, especially when one considers that § 13A — 1—2(7) defines a deadly weapon as that which is “manifestly designed, made, or adapted” for the purpose of “inflicting death or serious physical' injury.” Likewise, this testimony, even when viewed in the light most favorable to the State, is not substantial evidence in support of a finding beyond a reasonable doubt that Ware was armed with a “dangerous instrument,” considering the definition of this latter term as limiting it to instruments that, under the circumstances in which they are “used, attempted to be used, or threatened to be used,” are “highly capable of causing death or serious physical injury.” See § 13A-1-2(5).[17]
*420 As for the State’s attempt to rely upon the provisions of § 13A-8-41(b), proof beyond a reasonable doubt of the requirements prescribed by that subsection requires not merely that the victim subjectively believed that the defendant possessed, a “deadly weapon” or “dangerous instrument,” but that he or she also “reasonably ... believed” this to be true. The only evidence in this case of either a “subjective belief’ or a “reasonable belief’ that Ware possessed a “deadly weapon” or a “dangerous instrument,” as those terms are defined, is L.M,’s limited testimony that, as she was flailing about, she happened - to feel, “she thought,” “something sharp” in Ware’s back pocket. Such testimony is .simply too limited, vague, and equivocal to support a finding beyond a reasonable doubt of the “deadly weapon” or “dangerous instrument” element necessary for a conviction for first-degree armed robbery.[18]
We conclude that the State did not present sufficient evidence to' support a finding beyond a reasonable doubt of the “armed” element of first-degree robbery. Accordingly, the trial court should have granted Ware’s motion for an acquittal on the first-degree-robbery charge because one of the elements of that offense was not proven.
As to the first-degree-burglary conviction, the version of § 13A-7-5 in effect at the time of the offense in' 1993' included as an element of the offense that the defendant , be armed with a deadly weapon or use or threaten the use of a dangerous instrument. Specifically, the applicable version of § 13A-7-5 provided, in pertinent part:
“(a) A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, he or another participant in the crime:
“(1) Is armed with explosives or a deadly weapon; or
[[Image here]]
“(3) Úses or threatens the immediate use of a dangerous instrument."
(Emphasis added.) Significantly, § 13A-7-5 contained no analog to the provision in § 13A — 8—41(b) regarding conduct that constitutes prima facie evidence that the defendant was armed.
To convict Ware .of first-degree burglary under the above-quoted provision, the State was required to prove that he was armed with a deadly weapon or that he used or .threatened the immediate use of a dangerous instrument. As noted, there was no evidence indicating that Ware made any threat or used a knife or similar object.
In this case, the sufficiency-of-the-evidence issue turns on whether Ware was armed with a “knife or other sharp object” constituting a deadly weapon. As discussed in connection with the robbery conviction, the fact that L.M. felt, “she thought,” “something 'sharp” in Ware’s pants pocket is not sufficient to prove beyond a reasonable doubt that Ware was armed with a deadly weapon. Only through conjecture or speculation could one say that an unidentified “sharp”' object was a knife or similar deadly weapon.
*421 We conclude that the State did not present sufficient evidence to support a finding beyond a reasonable doubt of the “armed” element of first-degree burglary under the version of § 13A-7-5 in effect at the time of the offense. Accordingly, the trial court should have granted Ware’s motion for an acquittal on the first-degree-burglary charge.because one of the elements of that offense was not proven.[19]
Although the trial court erred in denying Ware’s motion for a judgment of acquittal on the first-degree-robbery and first-degree-burglary offenses, it appears that the State presented substantial evidence to support a conviction for a lesser-ineluded offense to each of the robbery and burglary ■ charges (third-degree robbery under § 13A-8-43, Ala.Code 1975, and second-degree burglary under § 13A-7 — 6(b), Ala. Code 1975). We therefore find it appropriate to remand the cause for the trial court to enter judgment as to those lesser-ineluded offenses and to impose appropriate sentences. See Ex parte Edwards, 452 So.2d 508, 510 (Ala.1984) (“ ‘State and federal appellate courts have long exercised the power to reverse a conviction while at the same time ordering the entry of judgment on a lesser-ineluded offense.’ ” (quoting Dickenson v. Israel, 482 F.Supp. 1223, 1225 (E.D.Wis.1980))). See also McMillian v. State, 58 So.3d 849, 853 (Ala.Crim.App.2010) (reversing conviction for first-degree domestic violence because of insufficient evidence that' deadly weapon was involved and remanding case with instructions to enter conviction on the lesser-included offense of second-degree domestic violence). -

IV. Conclusion

Based on the foregoing, we affirm Ware’s conviction and sentence as to the first-degree-rape charge. As to the first-degree-burglary and first-degree-robbery charges, we reverse the decision of the Court of Criminal Appeals and remand the case for that court to direct the trial court to vacate those convictions, to enter a judgment convicting Ware of the applicable lesser-ineluded offense as to each of the robbery and burglary offenses, and to impose appropriate sentences.
AFFIRMED IN PART;- REVERSED IN PART; AND , REMANDED WITH INSTRUCTIONS.
PARKER, J., concurs.
MAIN, J., and LYONS, Special Justice,* concur in part and concur in the result. ⅛ part.
MOORE, C.J., and STUART, BOLIN, SHAW, and BRYAN, JJ., concur in part and dissent in part.
WISE, J., recuses herself.**

. "DNA identification” or DNA profiling is
"[a] method of scientific identification based on a person’s unique genetic makeup; specif., the comparison of a person's deoxyribonucleic acid (DNA) — a patterned chemical structure of genetic information— *411 with the DNA in a biological specimen (such as blood, tissue, or hair) to determine whether the person is the source of the specimen. DNA evidence is used in criminal cases for purposes such ás identifying a victim's remains, linking a suspect to a crime, and exonerating an innocent suspect.”
Black's Law Dictionary 551 (9th ed. 2009).

. At the hospital, L.M, was examined and swabs were used to take samples of bodily fluids from L.M.’s vagina and mouth.

. The case file consists of approximately 41 pages that document, step by step, Cellmark’s handling of the swabs contained in the rape kit, the tests that were performed on the samples, and the results of the tests, most of which are in the form of machine-generated graphs. The case file also includes reports generated by the DFS documenting the collection of the samples from L.M. and the chain of custody.

. DellaManna also testified that the Cellmark laboratory technicians properly performed all tests on the biological material in accordance with the controls and procedures put in place by the DFS and that there were “no errors in [L.M.’s] case.”

. No documentary evidence was presented; the jail records were allegedly destroyed by a flood several years ago.

. “To meet that test, evidence must either fall within a 'firmly rooted hearsay exception’ or bear ‘particularized guarantees of trustworthiness.’ ” Crawford, 541 U.S. at 40 (citing Roberts, 448 U.S. at 66).

. The reference to civil-law mode of criminal procedure was a reference by the Crawford Court to the ex parte examinations traditionally used in the French criminal-law system, that is, officials would examine suspects and witnesses before trial and then read the examinations in court in lieu of live testimony. See Crawford, 541 U.S. at 43-44.

. Justice Thomas, who provided one of the five votes for the judgment in Melendez-Diaz, authored a concurring opinion in which he reasoned that the certificate of analysis at issue was an affidavit and thus fell " ‘within the core class of testimonial statements Melendez-Diaz, 557 U.S. at 329 (Thomas, J., concurring) (quoting White v. Illinois, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992)).

.The plurality opinion, authored by Justice Alito, received four votes; a dissenting opinion authored by Justice Kagan received four votes; Justice Thomas wrote an opinion concurring in the judgment but "sharing] the dissent’s view of the plurality’s flawed analysis.” Williams, — U.S. at -, 132 S.Ct. at 2255 (Thomas, J., concurring in the judgment). Justice Breyer concurred in the plurality opinion, but wrote separately to request that the case be reargued to more fully address how the Confrontation Clause applies to crime-laboratory reports and to suggest that the Confrontation Clause does not bar DNA reports from accredited crime laboratories.

. Justice Thomas, in his opinion concurring in the judgment in Williams, disagreed that there was any legitimate nonhearsay purpose for the analyst’s testimony, noting that ‘‘[t]here is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert’s opinion and disclosing that statement for its truth.” Williams, — U.S. at -, 132 S.Ct. at 2257 (Thomas, J„ concurring in the judgment).

. The latter propositions are in tension with Crawford's rejection of the "reliability” standard in Confrontation Clause cases and with Melendez-Diaz's rejection of a forensic-testing exception. Nonetheless, the Williams plurality did not overrule or expressly reject any portion of the holdings of Crawford, Melendez-Diaz, or Bullcoming.

. In Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), the Supreme Court stated that "[w]hen a fragmented Court decides a case and .no single rationale explaining the result enjoys the assent of five Justices, -‘the holding of the Court may be viewed as that position taken by the Members who concurred in the judgment on the narrowest grounds.’", In Johnson v. Board of Regents of University of Georgia, 263 F.3d 1234, 1248 n. 12 (11th Cir.2001), the United States Court of Appeals for the Eleventh Circuit concluded that the "Supreme Court has not compelled us to find a 'holding’ on each issue in each of its decisions. On the contrary, the Court has indicated that there may be situations where even the Marks inquiry does not yield any rule to be treated as binding in future cases." (Citing Nichols v. United States, 511 U.S. 738, 745-46, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994).) Given the 4-1-4 split and the nature of the view of the Confrontation Clause expressed by Justice Thomas, Williams may be such a case.

. Elaborating on the "substantial evidence” requirement, the court in Thornton quoted with approval from this Court's opinion in Ex parte Mitchell, 723 So.2d 14 (Ala.1998);
, " 'Rule 20.1(a), Ala. R.Crim. P., requires that a motion for a judgment of acquittal be granted as to any offense "for which the evidence is insufficient to support a finding of guilty beyond a reasonable doubt.” One commentator explains: "There must be substantial evidence tending to prove all the elements of the charge, and the burden is on the State to prove beyond a reasonable doubt that the crime has been committed and that the defendant was the person who committed, it.” H. Maddox, Alabama Rules of Criminal Procedure § 20.1, at 734 (2d ed.1994).’ ”
Thornton, 883 So.2d at 736-37 (quoting Mitchell, 723 So.2d at 15).

. Justice Shaw seeks to re-frame the question before us, asserting at the outset of his special writing that “[t]he main opinion holds that a rational juror could not conclude that a sharp object in the pocket of the pants of a man committing burglary, robbery, and rape was a deadly weapon.” 181 So.3d at 424 (Shaw, J., concurring in part and dissenting in part). We do not so hold; the question before us is not whether a rational juror could have concluded that a sharp object is a deadly weapon. Instead, as stated, the question we must, and do, decide is whether there was sufficient evidence introduced in this case that the object in the pocket of this man was a “deadly weapon” or "dangerous instrument,” as those terms specifically are defined in § 13A-1-2(7) and (5), Ala.Code 1975, respectively.

. As Justice Shaw notes, § 13A-l-2(7) also provides that the term “deadly weapon” includes certain types of knives, including a "switch-blade knife” and a "gravity knife.” 181 So.3d at 425. There is no evidence indicating that, if there was a sharp object in Ware's back pocket, it was one of those particular types of knives.
Justice Shaw also observes that "any sharp object can be 'manifestly designed, made, or adapted for the purposes of inflicting death or serious physical injury.’ ” 181 So.3d at 426 (last emphasis in original). This is true, but this is not the test. If it were, then it would be sufficient that an assailant have on his or her person a set of car keys, an ink pen, a pencil, or a even a cellular telephone or a pair of eye-glasses that could be broken so as to create a sharp edge or object. Indeed, almost any article of clothing worn by any defendant in any robbery or assault could be adapted for use in strangling a victim. It is critical to keep in mind, therefore, that the legislature had in mind not what "can be ‘... adapted for the purposes of inflicting death or serious physical injury,’ ” which would mean that almost any robbery would be an "armed” robbery, but what is "designed, made or adapted " for such purpose, and "manifestly” so. This is consistent with the legislature’s providing a list of examples in § 13A — 1—2(7) that reads as follows: "a pistol, rifle, or shotgun; or a switch-blade knife, gravity knife, stiletto, sword, or dagger; or any billy, black-jack, bludgeon, or metal knuckles.”

. There was no allegation in the indictment, and no evidence introduced at trial, that Ware made any representation to L.M. that he had in his possession a knife or other deadly weapon or dangerous instrument,

. Justice Shaw cites Ex parte Williams, 780 So.2d 673 (Ala.2000), for the proposition that, because a can of beans or peas in that case was considered a "dangerous weapon," we likewise must consider the "sharp object” L.M. thought she felt in Ware’s back pocket to have been a "deadly weapon" or "dangerous instrument.” 181 So.3d at 427 n. 21. Ex parte Williams, however, is distinguishable in relation to the requirements imposed by the relevant statutes. The Court explained in Ex parte Williams that "[the victim] said the man ... grabbed some canned 'beans or peas from a shelf’ and began hitting her with the can or cans." 780 So.2d at 674 (emphasis added). More specifically, the Codrt accepted the treatment' of the can as a dangerous instrument "used as the robbery victim says the robber in this case used a can (or cans) of peas or beans.” Id. at 674 (emphasis added). In contrast, in the present case, there was no evidence indicating that Ware ever removed from his pocket whatever it was that L.M. "thought” she felt there and, specifically, no evidence indicating that it was ever "used” or "manifestly ... adapted for the purpose of inflicting death or serious physical injury.” See §§ 13A-8-41(b) and 13A-1-2(5) and (7).

. Common experience suggests that there are numerous objects that might feel "sharp” when felt through the pocket of another person’s pants.Although many such items might be adapted for use as a weapon upder certain circumstances, most of those items would not constitute "deadly weapons” or "dangerous instrumentalities” as those terms are defined in the statute.

. As to both the robbery and the burglary convictions, the State does not suggest in ,its brief to this Court what the "something shaip” that L.M. thought she felt was. The State does, however, contend that the towel and plastic bag used in the rape were also "dangerous instrumentalities.” Id.. That contention fails because Ware’s indictment alleged that he was armed with a knife or sharp object. Further,- the record does not reflect that Ware used those objects for any purpose other than covering L.M.’s eye's.