WELCH, Judge.
William Claude Taylor appeals from the circuit court’s imposition of a sanction of 21 days in jail following its finding that Taylor had violated the terms and conditions of his probation. On June 19, 2014, Taylor pleaded guilty to one count of unlawful distribution of a controlled substance, two counts of unlawful possession of a controlled substance, and one count of unlawful possession of a controlled substance with intent to distribute. Taylor was sentenced under the presumptive sentencing guidelines to 150 months in prison. In accordance with the guidelines “non-prison” recommendation, that sentence was suspended, and Taylor was placed on five years’ probation. As a condition of his probation, Taylor was- ordered to complete a drug-treatment program.
While on probation, Taylor was alleged to .have violated his probation when he tested positive for amphetamine and methamphetamine. At a subsequent probation- . revocation hearing, at which Taylor was represented by counsel, Taylor denied the allegation, and the circuit court received testimony from Richard Prater, director of the Marshall County Court Referral Services drug-testing laboratory..
Prater testified that, as director of the laboratory, he “supervise^], oversee[s], and review[s] all the drug testing results.” (R. 33.) Prater testified that, when a person comes to the laboratory to provide a sample to be tested,
“they sign in on a sheet that’s sitting on the front counter. The person on the other side of the window pulls up their MIDASE[1]] information and WinTOX, which is our data management system, at the same time. They ascertain whether they have a charge or if they have to pay that day. They generate a chain of custody form. They hand the chain of custody form out to the donor, let them sign it. They put it in a tray. The collector picks it up, goes to the back, calls the donor back, collects the specimen. The specimen is taken directly into the laboratory. It is pipetted into a tube, put into the analy[z]er, tested, and then resulted out.”
(R. 34.) Prater also testified that,
[o]nce the sample comes back to the lab and it goes from the collection area right around the corner to the laboratory, the chain of custody, the barcode labels, you know come to us. We label the tube. We make sure that they match. We pipetted the specimen. It’s put into the barcoded rack. And then it’s inserted in the analyzer, and the analy[z]er pretty much does everything else until we get the result.”
(R. 38.)
When Prater was asked about the chain of custody of the sample, he stated: •
“At the time the chain of custody is generated, there’s a barcode label at the bottom of it. We also print out multiple barcode labels that are attached to that chain of custody form. When the individual comes back to have their specimen collected, we take one of those barcode labels and put it on the specimen cup. They provide us with the specimen. The chain of custody and the additional bar-code labels go forward with that, and the person who is pipetting the. specimens takes the other barcode label off, puts it on the tube, makes sure that it all *271 matches, and then pipettes the specimen.”
(R. 39.) Prater testified:
“We can print a result, a hard copy of a result. Ordinarily it comes across, it just shows us the range of drugs that we requested be tested for, positive or negative, and in our case, because we do quantitative testing, it gives us actual numbers. I review it,-and I either approve it or I hold it. We also—the machine also knows to do reflex testing on things such as opiates, which will do additional testing on a positive specimen.
«
“If for some reason we had a validity issue or an invalid specimen, aliquot sample, something like that, where it looks like if we took the specimen and re-ran it we would get a more reliable result.” •
(R. 41-42.)
Prater testified that every person who provides a urine sample is observed providing the sample. Prater testified that Taylor’s sample was collected at 8:01 a.m. and that the test was performed at 2:48 p.m. - the same day. After the sample is tested, the result “comes up in [the] data management system.” (R. 37.) Prater reviews the result and either approves it or suggests further testing. Once the result is approved, the data-management system automatically e-mails those results to the requesting party. Prater testified that he has input on every sample that goes through the laboratory.
Prater testified that the laboratory collected a sample from Taylor on September 25, 2015. Prater was presented with the chain-of-eustody form for the sample, State’s Exhibit 1, and testified that the form was commonly used in the business practice at the laboratory and used in every sample taken. Prater testified that the form “allows us to perform the test. Also that verifies, when the donor signs it, that he’s aware that this is, you know, they’re supposed to look at the barcode labels; they’re supposed to look at the date to verify that they understand and sign off on this chain of custody form.” (R. 46.) Prater testified that Taylor’s signature appears on the form and that the form also contains the initials and signature of Eric Croft, the employee' who collected Taylor’s sample. Prater testified that the laboratory had five employees, including himself. The collectors were Croft and Erica Kelly. The other two employees were Morgan Diamond and Jordan Compton. Prater testified that the collectors would not do technician work. Although Prater did not provide testimony regarding the employee who retrieved the sample and placed it in the rack with other samples to be fed into the analyzer, the chain-of-custody form indicates that an employee with the initials, J.C., presumably Jordan Compton, was the employee responsible. ‘
The prosecutor presented Prater with the printout of the test result, State’s Exhibit 2, which indicated that Taylor’s sample had tested positive for amphetamine and methamphetamine. Prater testified that methamphetamine is a derivative of amphetamine and ■ that amphetamine is used to manufacture methamphetamine. Prater stated that the laboratory conducts a reflex test of “amphetamine positive” to determine whether the amphetamine is amphetamine such as “Adipex or Adderall or if it is methamphetamine or ecstasy.” (R. 59.)
At the conclusion of Prater’s testimony, the circuit court allowed the parties to present argument. The prosecutor stated:
“Judge, simply regarding the statement, again, it is a third positive. There have been a couple of issues. And again, he’s already been jail-to-treatment. And *272 it’s our position again that he’s due to be sanctioned for a positive test from September 24, 2015, and as part ,of that sanction, his treatment be upgraded to a jail-to-treatment order.”
(R. 97.) •
Defense counsel stated:
‘Your Honor, I would just state first that my client has the right to confront and cross-examine the' person who did the analysis. That’s riot happened here today. I don’t believe also the chain of custody has been shown that that’s the same substance that was collected from him that was actually tested and, is reflected in the report that we received, Your Honor.
“I’d .also point out that he has given two hair follicle samples that tested negative. He’s given two Madison County samples that tested negative. According to Mr. Prater, he’s since given 20 specimens that were clean.
‘Your Honor, I think that there’s enough testimony for-the chain of custody, that’s questioned by the chain of custody that this could have been a switch with somebody else’s or could have been some issue. He went out and requested confirmation and also ■ did a hair follicle test to try to show, Your Honor, that he did not consume illegal drugs. We would just ask that he be allowed to continue on drug court.” '
(R. 97-98.)
The prosecutor responded:
“Judge, we’re not asking that he be revoked. We’re simply asking that he comply within the parameters and requirements of drug court. Again, a part of that is being appropriately sanctioned. And we’re not to the point, and hopefully he does not ever get revoked. We want to see, Mr. Taylor succeed., Just because .we’re pushing,this issue does not mean that we want him to be revoked. We hope that he has his sanction, completes his sanction, and successfully grades from Phase II Drug Court.”
(R. 98-99.)
The circuit court issued its ruling, stating:.
“Looking at the issue of chain of custody, the Court feels that, pursuant to the testimony offered by the State, that the procedures in place and that were followed in' this case are sufficient to show confidence in the chain of custody to show thát the drug or the urine sample tested was that of the defendant.
“Now with regard to the testing methods,, the testing methods that were used by the lab are, I think, clearly acceptable either under the Frye or. Daubert standard and have been admitted in other courts. And I have admitted them previously in contested hearings.

((

“The hair follicle test, that was presented by the defense shows negatives. I will .also note that in looking at the dates the test were administered would be outside the window of that that’s recommended by both of these articles submitted, one by the State and one by the defense, for an, acceptable time period for the reliability of the testing.
“The test that was. performed at the drug testing lab at Albertville was one that was performed on urine- that was collected, and the Court believes would show or be representative of the drugs being in his system at that moment. That being said, the Court also notes from the proof presented by the defendant, that on at least 20, it looks like maybe 22 drug tests that he’s had since, this has been pending, that he’s tested negative, and that, to me, is one of the big things. You want to make sure that he remains drug-free. That’s our objec *273 tive. And I was all on board for him being required to go into treatment when this thing started. After seeing that .he’s remained drug-free for about 20-plus drug tests, I’m not convinced that that’s a correct assessment of his situation that he actually needs to go to treatment.
“However, there is a sanction involved for a positive drug test. And the Court has a hard and fast rule in regards to that, and that is it’s followed. I think it’s discretionary to whether we do a treatment upgrade for him, and that’s not really a sanction. But the Court feels that with what’s been presented here today, that' it’s.not necessary for him to undergo a treatment upgrade and go into in-patient treatment.
“However, a third sanction for a positive drug test would be 21 days in the county jail, and that is a sanction which the Court is going to impose. And by the way, the Court finds that the burden of proof in the probation revocation relating to these issues is not beyond a reasonable doubt. It is instead that the Court be reasonably satisfied. The Court feels that the State' has met that burden of proof of reasonably satisfying the Court as to the violation. Therefore, the Court' feels that, based on the offense committed, the Court finds that there’s a need for incarceration and that no measure short of confinement will avoid depreciating the seriousness of the violation.
“It’s therefore ordered that the defendant remain in drug court and that remain on probation. However, the Court does sanction the defendant to serve a period of 21 days in the county jail and does not order a treatment upgrade.”
(R. 99-102.)
The trial court entered a written order stating that based upon the testimony of Prater and the exhibits admitted it found that Taylor had failed to comply with the terms and conditions of probation by testing positive for controlled, substances. The trial court ordered that Taylor be sanctioned by serving 21 days of jail time in the Marshal County jail.' This appeal followed. . ..
On appeal, Taylor argues that the circuit court erred in finding that he had violated his probation because, he says, it baséd its finding solely on hearsay. Specifically, Taylor- contends that the circuit court based its decision on a drug-analysis that.the State’s only witness, Prater, did not actually perform. Taylor also argues that the circuit court ■ should not have based its fiiiding solely on 'a drug analysis when, he contends, the chain of custody for the sample provided was not proven.
Although Taylor objected to the admission of the report on the ground that the State had failed to prove chain of custody and argued at the conclusion of the hearing that, in addition to the State failing to prove chain of custody, he had been denied the right to confront and to cross-examine the employee who placed the sample into the analyzer, Taylor never objected to the sufficiency of the evidence, either at the conclusion of the hearing or in a post-judgment motion, on‘the ground that the only evidence presented was hearsay. Accordingly, Taylor failed to raise the specific objection that he now raises on appeal. Because Taylor'did not present this argument to the circuit court, ■ it is not preserved for appellate review. Singleton v. State, 114 So.3d 868, 870 (Ala.Crim.App.2012)(holding, that, because the sufficiency of the, evidence presented at the probation revocation hearing was presented .for the first time on appeal, it was not preserved). See also Quattlebaum v. State, 29 So.3d 925, 927 (Ala.Crim.App.2009)(holding that Quattleb *274 aum’s claim that the'court relied solely on hearsay evidence was' not preserved for review).
' With respect to Taylor’s argument that the circuit court erred in considering the drug analysis, we note that this Court has ■held that forensic reports in the nature of the laboratory report that was attested to by Prater are admissible in probation-revocation proceedings, even where they may constitute hearsay or are objected to on chain-of-custody grounds, because strict rules of evidence are not applicable in revocation hearings. This Court has held that
“ ‘ “a probation revocation hearing is not criminal in nature, and therefore neither formal procedures, nor formal rules of evidence need be followed by the trial court.” ’ Allen v. State, 644 So.2d 45, 46 (Ala.Crim.App.1994)(quoting Smith v. State, 445 So.2d 573, 574-575 (Ala.Crim.App.1984)); Thompson v. State, 356 So.2d 757 (Ala.Crim.App.1978); Goodrum v. State, 418 So.2d 942 (Ala.Crim.App.1982). Formal procedures and the application of strict rules of evidence are not required in [a] probation revocation hearing. See Allen, 644 So.2d at 46.”
Chenault v. State, 777 So.2d 314, 316 (Ala.Crim.App.2000). See also Longmire v. State, 575 So.2d 1229 (Ala.Crim.App.1990).
To the extent that Taylor’s arguments on appeal can be construed as an argument that the drug-analysis report should not have been allowed because it violates .his right to confront and to cross-examine the technician who submitted the sample into the. analyzer,, we find that claim to be without merit.
In Chambers v. State, 181 So.3d 429 (Ala.Crim.App.2015), this Court stated:
“In Ex parte Ware, 181 So.3d 409 (Ala.2014), the Alabama-Supreme Court addressed the issue- whether Ware’s Sixth Amendment right to confront witnesses against him was violated when the circuit court admitted into evidence a DNA-proffle report that was based on the work of laboratory technicians who did not testify at trial. The Court analyzed the United States Supreme Court’s decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and the decisions following Crawford stating:
“ ‘The Sixth Amendment of the United States Constitution provides in part that, “[i]n all criminal prosecutions, the accused shall enjoy thq right ... to be confronted with the witnesses against him.... ” In Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court held that the Confrontation Clause does not bar admission of an unavailable witness’s statement against a criminal defendant if the statement bears “adequate ‘indicia of reliability.’ ”
‘“In Crawford, the United States Supreme Court overruled Roberts,- rejecting the “reliability” standard and holding that the right to confront witnesses applies to all out-of-court statements that are “testimonial.” 541 U.S. at 68. Although the Crawford Court did not arrive at a comprehensive definition of “testimonial,” it noted that “the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.” 541 U.S. at 50.
[[Image here]]
“ ‘Since Crawford, the Supreme Court has released three decisions addressing the application of the Confrontation Clause to forensic-testing evidence. In Melendez-Diaz v. Massa *275 chusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the Supreme Court held that a sworn certifícate of analysis attesting that certain materials were cocaine was a testimonial statement. The Court, in Melendez-Diaz declined to create a forensic-testing. exception, and it rejected the argument that the certificate at issue there was not testimonial because it was not “accusatory.”.
“ ‘In Bullcoming v. New Mexico, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Supreme Court held that the Confrontation Clause applied to an unsworn forensic-laboratory report certifying the defendant’s blood-alcohol level, where the report was specifically created to serve as evidence in a criminal proceeding and there was an adequate level of formalities in the creation of the report.
“‘In Williams v. Illinois, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), the United States Supreme Court held, in a plurality opinion, that the Confrontation Clause was not violated where an expert was allowed to offer an opinion based on a DNA-profile report prepared by persons who did not testify and who were not available for cross-examination. Williams involved a bench trial in which a forensic specialist from the Illinois State Police laboratory testified that she had matched a DNA profile prepared by an outside laboratory to a profile of the defendant prepared by the state’s lab. The outside lab’s DNA report was not admitted into evidence, but the testifying analyst was allowed to refer to the DNA profile as having been produced from the semen sample taken from the victim.
“‘The plurality opinion concluded that the analyst’s testimony was not barred by the Confrontation Clause for two independent reasons, neither of which received the concurrence of a majority of the Court. First, the plurality concluded that the expert’s testimony was not admitted for the truth of the matter' asserted but was admitted only to provide - a basis for the testifying expert’s opinions. Second, the plurality concluded that the DNA-profile report was not testimonial because its primary purpose was not to accuse the defendant or to create evidence for use at trial, but “for the purpose of finding a rapist who was on the1 loose.” Williams, 567 U.S. at 58, 132 S.Ct. at 2228. The Williams plurality also noted the inherent reliability of DNA-testing protocols and the difficulties in requiring the prosecution to. produce the analysts who did the testing.’
“Ex parte Ware, 181 So.3d at 413-15 (footnotes omitted).
“In light of the fractured decisions of the United States Supreme Court ’ on this issue, our Supreme Court in Ware concluded that a case could be ‘made for both sides of the issue whether the DNA-profile report in [Ware’s] case was “testimonial” under the “holdings” of Melendez-Diaz, Bullcoming, and Williams.’ 181 So.3d at 416. However, the Court did not resolve the issue because, it concluded that ‘the Confrontation Clause was satisfied by the testimony’ of Jason E. Kokoszka, an employee of Orchid Cellmark Laboratory ‘who supervised and reviewed the DNA testing and who signed the DNA-profile report.’ 181 So.3d at 416. The Court concluded
“ ‘that Kokoszka’s testimony in this ease satisfied the purpose of the Confrontation Clause. Kokoszka signed the DNA-profile report and initialed each page of Cellmark’s “case file” *276 that was also admitted, into evidence. Kokoszka testified that he was one of the individuals taking responsibility for the work that resulted, in the report and that he had. reviewed each of the analyses undertaken to determine that they were done according to standard operating procedures and that the conclusions drawn were accurate and appropriate.. Kokoszka’s testimony at trial provided Ware with an opportunity to cross-examine Kokosz-ka about any potential errors or defects -in the testing and analysis, including errors committed by other analysts who had worked on the case.’
“Ex parte Ware, 181 So.3d at 416-417.” 181 So.3d at 436-37.
In this case, although the technician who submitted the sample to be tested via the machine did not testify at the hearing, Prater, the director of the laboratory, testified about the procedures used at the laboratory and that he supervised and reviewed all test results, including Taylor’s. This testimony provided Taylor with ample opportunity to cross-examine Prater regarding the’ drug-analysis report. The technician who placed the sample into the analyzer machine did not conduct any analysis on the sample. The analysis was done by the' analyzer machine, from which the result was sent to Prater’s' computer. Prater reviewed Taylor’s test result. Therefore, we find that Taylor’s right to confront the witnesses against him was not violated when Prater' testified on the employee’s behalf regarding the drug-analysis report.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
Windom, P. J., and Kellum and Burke, JJ., concur. Joiner, J., concurs specially, with opinion.

. Prater testified that MIDAS is a state-offender database.